

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-14-00229-CR

CHRISTOPHER J. GONZALEZ          APPELLANT

V.

THE STATE OF TEXAS          STATE

----------

FROM CRIMINAL DISTRICT COURT NO. 1 OF TARRANT COUNTY
TRIAL COURT NO. 1320894D

----------

## MEMORANDUM OPINION[1]

----------

In six points, Appellant appeals his conviction for continuous sexual abuse of children. We affirm.

---

[1]*See* Tex. R. App. P. 47.4.

## I. Factual and Procedural Background

Anna and Belinda are the daughters of Adam and Whitney.[2] Adam's sister Esperanza[3] is married to Appellant Christopher Gonzalez, and they have three children, Luiz, Melanie, and Natalie. From 2009–2013, Gonzalez, Esperanza, and their adult daughter Natalie periodically babysat Anna and Belinda while Whitney and Adam were working.

In early January 2013, while Adam was putting three-year-old Belinda down for a nap, she asked him if he wanted her to pat him on the butt like Uncle Chris. Adam, who had recently seen Belinda slap her sister on the bottom, interpreted Belinda's question to refer to innocent contact of that nature. So Adam disregarded her comment, responded "no," and proceeded to put Belinda down for a nap. It did not occur to him to mention her remark to his wife or anyone else.

Approximately a week later, on January 15, 2013, while Whitney was putting Belinda down for a nap just after lunch, Belinda blurted out, "Tio Chris

---

[2]In accordance with rule 9.8, we refer to children and family members by pseudonyms. Tex. R. App. P. 9.8 cmt, *see id.* 9.10(a)(3).

[3]In the record, Esperanza is referred to by three names: Esperanza, Tia Espera (which is Spanish for "Aunt Espera"), and Despera. The name "Despera" appears to find its genesis with the forensic investigator, who, upon hearing the young girls refer to "Tia Espera," thought she heard them say "Despera" and repeated that name back. Thereafter, the name "Despera" was likewise erroneously picked up and repeated throughout the record by the attorneys and other adults, including the court reporter, as another name the girls used for Esperanza.

made me touch his butt." Whitney testified that she was surprised at Belinda's comment, so she made Belinda repeat it to make sure she heard it correctly. After Belinda repeated herself, Whitney asked her when it happened. Belinda answered that she did not know. Then Whitney asked, "Where did this happen?" and Belinda responded, "At his house." Whitney testified that she questioned her daughter further:

> A: I said, what part is his butt? And she pointed to herself in her front crotch area.[4]
>
> Q: And did you ask her anything else after she pointed there or what happened next?
>
> A: I gave her a doll, we had a male Barbie doll and I asked her to show me on him. He was fully dressed and she took off his pants and pointed at the doll's penis.

At some point during the course of their conversation Belinda also told Whitney that Gonzalez had done something to Anna. So later that afternoon, after Anna came home from school and finished her homework, her mother sat her down on the couch and began asking her questions:

> A: . . . I first asked her if she knew what private parts were and she answered and said yes and pointed to her private parts. I asked her has anybody shown her their private parts and she told me a story about a little boy who came out of the bathroom with his pants pulled down because he didn't know how to buckle his pants at school. And I asked her if any grownups had ever shown her their private parts and she said Tio Chris made me taste his butt one time.

---

[4]Anna and Belinda referred to the penis as the "middle part" or "front butt" in speaking about the abuse.

. . . .

Q:  Okay.  And did you ask [Anna] anything else after she said that?

A:  I asked her to tell me about it and she did.  She explained to me that she was at Chris' house in their kitchen.  That he had put a blindfold over her eyes and told her to open her mouth, that he was going to give her a Fruit Roll-Up.  And she said he unbuckled his pants and put his front butt inside of her mouth instead of the Fruit Roll-Up.[5]

. . . .

Q:  Okay.  And did she tell you anything else?

A:  She told me that at a different time he had made her touch his front butt under a blanket while they were sitting on a couch – on the couch.[6]

. . . .

Q:  Okay.  So what happened that time?  What did she tell you?

A:  She said that they were sitting on the couch and he covered both of them up with a blanket, grabbed her hand and put it on his front butt she calls it.

After her conversation with Anna, Whitney called her husband, whom she had spoken to earlier in the day regarding Belinda's revelation.  At this point, he came home immediately.  Whitney also called her mother and asked her to come

---

[5]Anna, who was six years old at the time of her outcry, told her mother that she was six when this happened.

[6]Anna told her mother that she was four years old when this happened.

over.[7] In the meantime, Adam contacted his sister Esperanza and she came over to the house as well. According to Whitney, once their father, grandmother, and aunt had arrived, the girls came into the living room "one at a time" and repeated their stories to the adults.

To complicate matters, the girls have two uncles named Chris. According to their parents, the girls generally refer to Gonzalez, their paternal uncle, as Tio Chris, but he is sometimes referred to as Uncle Chris as well. Their maternal Uncle Chris is called Uncle Chris, but never Tio Chris. In addition, the girls have a male cousin named Chris.

Both Adam and Whitney testified that they were able to clarify that both of the girls were referring to Gonzalez with regard to the incidents of alleged abuse, and given what the girls had revealed to them that evening, Whitney and Adam contacted the police the next morning. An investigation then ensued.

Approximately two weeks later, both girls were separately interviewed by Joy Hallum, forensic investigator, at Alliance for Children. Their interviews were videotaped.

Gonzalez was charged with continuous sexual abuse of a child, and the case was tried to a jury. After the trial court found both Anna and Belinda

---

[7]When asked why she called her mother, Whitney responded, "Because she is my mom and I wanted her with me."

competent to testify, both videotaped interviews were shown to the jury. The jury heard their live testimony regarding the allegations of abuse as well.

The jury found Gonzalez guilty of continuous sexual abuse of children younger than 14 years of age and sentenced him to 43 years' confinement.

## II. Belinda's Competency to Testify

In his first point, Gonzalez challenges the trial court's determination that five-year-old Belinda was competent to testify.[8] First, Gonzalez points to Hallum's interview notes in which she indicated that Belinda appeared not to be competent. Gonzalez also cites several examples of Belinda's "inability to remember what she said or what allegedly happened": (1) Belinda did not remember the family argument that occurred on January 15, 2013, (2) Belinda did not remember that she said that the event happened in the laundry room, (3) Belinda remembered that the event happened in the nursery at Belinda's house, (4) Belinda's mother and father "had to help her prepare for her testimony in court," (5) Belinda did not remember telling Hallum that her dad had slapped her in the face, (6) Belinda was unable to recall how she touched her uncle's butt, (7) Belinda did not remember telling Hallum that she did not remember how "Uncle

---

[8]Gonzalez's Point of Error Number One actually states, "The trial court abused his [sic] discretion in allowing the testimony of the child witness [Anna Isabel] who was not competent to testify." However, in his argument, Gonzalez actually complains only about the testimony of Belinda and makes no mention of Anna's testimony or her competence to testify. Consequently, we treat this point as a complaint as to the younger child, Belinda, but not as to Anna.

Chris" made her touch his butt, and (8) Belinda "never identified the Defendant, Christopher Gonzalez as the person who allegedly abused her." Finally, Gonzalez refers us to the Statement of Facts "for a complete example of the incompetence of [Belinda] and her failure to identify Christopher Gonzalez as her abuser."

A trial court's determination of whether a child witness is competent to testify is reviewed for abuse of discretion. *Broussard v. State*, 910 S.W.2d 952, 960 (Tex. Crim. App. 1995). We review the child's responses to qualification questions as well as the child's entire testimony to determine whether the trial court's ruling constituted an abuse of discretion. *Davis v. State*, 268 S.W.3d 683, 699 (Tex. App.—Fort Worth 2009, pet. ref'd); *De Los Santos v. State*, 219 S.W.3d 71, 80–81 (Tex. App.—San Antonio 2006, no pet.); *Fox v. State*, 175 S.W.3d 475, 481 (Tex. App.—Texarkana 2005, pet. ref'd).

All witnesses are presumed competent to testify, including children. Tex. R. Evid. 601, 60 Tex. B.J. 1143 (Tex. & Tex. Crim. App. 1998, amended 2015);[9] *see also Gilley v. State*, 418 S.W.3d 114, 121 (Tex. Crim. App. 2014) ("Under

___

[9]The Texas Rules of Evidence were amended effective April 1, 2015. We will refer to the version of the rules that were in effect at the time of trial in May 2014, and note that the Texas Supreme Court and Court of Criminal Appeals have noted that the amendments comprise a general restyling of the rules and with the exception of two rules not applicable here did not make substantive changes. *See* Tex., *Final Approval of Amendments to the Texas Rules of Evidence*, Misc. Docket No. 15-9048, 78 Tex. B.J. 374 (Mar. 10, 2015), and Tex. Crim. App*., Final Approval of Amendments to the Texas Rules of Evidence*, Misc. Docket No. 15-001, 78 Tex. B.J. 376 (Mar. 12, 2015).

this provision, '[t]he party seeking to exclude the witness from testifying must raise the issue of his competency and *shoulders the burden of establishing incompetency.*'" [emphasis added] (citing Steven Goode et al., 1 *Texas Practice Series: Guide to the Texas Rules of Evidence* § 601.2 (2002 ed.)), *cert. denied*, 135 S. Ct. 57 (2014). When competency is challenged, however, the trial court must make a determination of whether the child (1) had the ability to intelligently observe the events in question at the time of the occurrence and (2) has the capacity to recollect and narrate the events. *Torres v. State*, 33 S.W.3d 252, 255 (Tex. Crim. App. 2000) (quoting *Watson v. State*, 596 S.W.2d 867, 870 (Tex. Crim. App. 1980)); *Hollinger v. State*, 911 S.W.2d 35, 38–39 (Tex. App.—Tyler 1995, pet. ref'd). A witness has the capacity to narrate if the witness is able to understand the questions asked, frame intelligent answers to those questions, and understand the moral responsibility to tell the truth. *Davis*, 268 S.W.3d at 699 (citing *Watson*, 596 S.W.2d at 870; *Hollinger*, 911 S.W.2d at 39).

Prior to receiving her testimony, the trial court questioned Belinda on whether she knew what it meant to tell the truth or to tell a lie and whether she understood the difference between the two, and the record indicates that Belinda nodded her head yes. When the trial court asked Belinda what she thought it meant to tell the truth, she responded, "That means you don't lie . . . [o]r you would get in trouble." Belinda, who was wearing a pink shirt, also said that calling her shirt pink would be the truth, but calling her shirt orange would be a

8

lie.  Based on its examination of Belinda outside the presence of the jury, the trial court found her competent to testify.

## A.  Hallum's Interview Notes

During her interview with Hallum, Belinda said she was three years old, and she correctly identified colors and animals when shown to her.  But when Belinda was asked, "If somebody – if they said that you were a boy, is that right or wrong?" Belinda answered, "Right."   She also answered "Real" to the question, "If somebody said that you were a boy, is that real or not real?"  To the question, "[I]f somebody said that [a picture of a] cow was a pig, is that right or is that wrong?", Belinda answered "Right."[10]  After the interview, Hallum completed a form on which she indicated that Belinda appeared to be incompetent.  She explained at trial that she indicated that because Belinda "just couldn't do truth/lie or right/wrong" during the interview, but she further clarified that Belinda's inability to correctly answer those questions was not a reason to stop the interview with Belinda, and that, in her opinion, it did not "take away" from her outcry of sexual abuse.  Hallum testified that she did not notice anything in the interview that might affect Belinda's ability to intelligently observe events or to narrate what had happened, or her moral responsibility to tell the truth.

---

[10]Hallum explained that when interviewing children, she asks these questions in order to assess where the child is mentally and educationally.

While the court could properly consider Belinda's answers to Hallum's competency questions, as well as her note that Belinda appeared incompetent, Hallum's findings that Belinda could not correctly distinguish real versus unreal and right versus wrong are not binding on the court. It was the trial court's duty to make an independent determination of whether Belinda was competent to testify at the time of trial. *See* Tex. R. Evid. 601(a)(2); *Gilley*, 418 S.W.3d at 121 (stating that the trial court itself must make an independent ruling on competency).

## B. Examples of Inability to Remember Events

Belinda's trial testimony demonstrated that she knew her correct age and that she was born in March. She identified her immediate family, including the family dog, and members of Gonzalez's family. She identified her favorite color and her favorite movie. She confirmed her level of education as "graduated" from "pre-K," and she recalled her teacher's name. Belinda testified that she knew that "you get in trouble" if you tell a lie, and she promised to only talk about things that really happened. She also testified that knew she was in court to talk about her "Uncle Chris," who, according to Belinda, had three children—Luiz, Melanie, and Natalie.

Gonzalez argues that Belinda's inability to remember the family argument that occurred on January 15, 2013, and how she "touched her uncle's butt" evidences her incompetency to testify. With regard to the latter, Gonzalez provides no reference to the record to support his contention that she so testified,

10

and we have not located any such testimony in our review of the record.[11] Parties are required to provide citations to the record in support of their arguments, and we are not obligated to search the record for facts favorable to a party's position. Tex. R. App. P. 38.1(i); *Lucio v. State*, 351 S.W.3d 878, 896 (Tex. Crim. App. 2011); *Busby v. State*, 253 S.W.3d 661, 673 (Tex. Crim. App. 2008) (stating that the court "has no obligation to construct and compose appellant's issues, facts, and arguments 'with appropriate citations to authorities and to the record'"), *cert. denied*, 555 U.S. 1050 (2008). Regardless, we have thoroughly reviewed this record in resolving this issue in accordance with the applicable law and standard of review.

As to her lack of memory of the family argument, while no one disputed that the argument occurred, the evidence at trial was conflicting as to whether Belinda actually witnessed it. Whitney testified that the girls were in another room with the door closed when the argument happened while Esperanza testified that the girls were in the same room where the argument took place.[12] While the evidence at trial could support Gonzalez's contention that Belinda did not remember the family argument, it is equally plausible from this record that

---

[11]While in her interview, Belinda states that she did not "remember yet" *how he made her* touch his "butt," we can find no place in the record where Belinda states that she did not remember *how she* touched his "butt." To the contrary, in her interview she does describe how she touched his penis.

[12]Esperanza also testified that Whitney's mother got between her and Adam to *prevent* them from fighting in front of the girls.

11

Belinda could not recall the family argument because she was never aware that it had occurred.

Gonzalez also points to an inconsistency in Belinda's recollection as to where the incident of abuse occurred. His argument is two-fold, i.e., that she testified that she did not recall that she said that the incident had occurred in the laundry room, and she also testified that the event occurred in the nursery. The record does not bear this out. During Belinda's testimony, a laundry room was mentioned, along with other rooms, including a nursery and a guest room, but the record is less than clear as to what, if anything, occurred in any of these rooms because, as phrased, the initial question posed on cross-examination was ambiguous. When viewed in context, it is equally plausible that Belinda's initial answer referred to the location where the outcry, not the abuse, occurred:

> Q: [Belinda], do you remember where you said this event happened, the very first time you told your mom or dad? Do you remember where?
>
> A: At my house.

The follow-up questions and answers to this question were even more vague. Belinda's testimony was in response to whether she remembered "any other places" or remembered "saying a laundry room" and "saying a nursery," without tying those questions to any event that might have occurred in any of those places:

> Q: At your house. Okay. Do you remember any other places?

A: No.

Q: Okay. Do you remember saying a laundry room?

A: No.

Q: Okay. That's okay. Do you remember saying a nursery?

A: Yes.

Q: Who has a nursery? Do you have a nursery at your house for the baby?

A: My mom and dad.

Q: Okay. At your house where you live, right?

A: Uh-huh.

Q: And your little baby brother?

A: (Witness nods yes.)

Q: Does Mimi and - - do Mimi and Papa, do they have a nursery?

A: No.

Q: When you baby-sit - - when they baby-sit you, where does the baby sleep?

A: In a crib.

Q: Okay. And do—do you know what room the crib is in?

A: Their guest room.

Q: I'm sorry? One more time.

A: Their guest room.

Q: Guest room, okay. Sorry, I didn't quite hear you. I didn't hear that.

13

What about your grandma and grandpa, do they have a nursery for the baby, your other grandma and grandpa?

A: Yes.

Q: They do?

A: (Witness nods yes.)

Q: And where - - where is that room, do you know?

A: In their guest room.

Q: The guest room?

A: (Witness nods yes.)

On this record, it cannot be definitively said that Belinda testified either that she did not remember saying the abuse occurred in the laundry room or that the abuse occurred in the nursery. And while at one point in her testimony, Belinda also stated that "that thing that happened that [she] didn't like" happened in the hallway, any inconsistencies or conflicts between her testimony and her interview with Hallum go to the weight of Belinda's testimony, not to its admissibility. *Woods v. State*, 14 S.W.3d 445, 451 (Tex. App.—Fort Worth 2000, no pet.); *Upton v. State*, 894 S.W.2d 426, 429 (Tex. App.—Amarillo 1995, pet. ref'd).

Gonzalez further argues that Belinda's failure to recall other prior statements also evidences her incompetency. He identifies two such incidences when Belinda failed to acknowledge or recall prior statements that she had made in her interview with Hallum: (1) Belinda's statement that her dad had slapped

14

her in the face and (2) her statement that she did not remember how "Uncle Chris" made her touch his butt.

Not even adult witnesses are expected to have perfect recall. *See, e.g.*, *Rodriguez v. State*, 772 S.W.2d 167, 170 (Tex. App.—Houston [14th Dist.] 1989, pet. ref'd) (holding that 83-year-old witness was competent to testify in spite of the fact that she had Alzheimer's disease and did not remember certain things, but her testimony regarding the incident in question was "coherent and intelligible"); c*f. Roberts v. State*, No. 14-08-00126-CR, 2009 WL 6338618, at *8 (Tex. App.—Houston [14th Dist] Sept. 24, 2009, pet. ref'd) (mem. op., not designated for publication) (noting that none of the witnesses had a perfect memory of the underlying events and that it was up to the jury to determine the weight to be given their testimony). That this five-year-old did not remember every detail of the day she told her mother about the abuse, or every statement she made to Hallum sixteen months prior to testifying at trial, did not render her incompetent. *See, e.g.*, *In re A.W.*, 147 S.W.3d 632, 635 (Tex. App.—San Antonio 2004, no pet.) (holding that child witness was competent even though she testified she "kind of remember[ed]" everything juvenile defendant did to her). Indeed, "[c]onfusing and inconsistent responses from a child are not reasons to determine she is incompetent to testify." *Id.*; *see also Berotte v. State*, 992 S.W.2d 13, 17–18 (Tex. App.—Houston [1st Dist.] 1997, no pet.) (stating that four-year-old was competent to testify even though she frequently nodded or

15

shrugged in response to questions and much of her testimony was contradictory and confusing).

Gonzalez also complains that Belinda's mother and father "had to help her prepare for her testimony in court." This characterization of the evidence is an overstatement. Belinda's entire testimony on this subject consisted of the following exchange:

Q: . . . did you talk with anyone to help prepare you for today?

A: Yes.

Q: Who? Mommy? Daddy?

A: Mommy and daddy.

Notably, Gonzalez points to no testimony that Belinda's mother and father "*had to help her*" prepare for her testimony in court. [Emphasis added.] Belinda merely confirmed that they *did* help her prepare. Although given an opportunity to develop this testimony through cross-examination of Belinda's parents, who testified subsequent to Belinda's testimony, Gonzalez elicited no testimony with regard to what that preparation entailed. Furthermore, Belinda was five years old at the time of trial. For Belinda's parents to help prepare her to testify in court in front of a jury is neither surprising, nor does it in and of itself call into question her competency to testify. *See, e.g.*, *Ohio v. Clark*, 135 S.Ct. 2173, 2182 (2015) ("Few preschool students understand the details of our criminal justice system.").

Finally, Gonzalez argues that "more telling yet" is the fact that Belinda was never asked to identify who abused her and that she "never identified the

Defendant[,] Christopher Gonzalez as the person who allegedly abused her." In fact, she did. In describing the abuse, Belinda testified,

Q: Okay. When you were over at Uncle Chris'[s] house, did anything happen that you didn't like?

A: Yes.

Q: Okay. And what happened? Well, do you remember how old you were?

A: Three.

Q: Three. And when you were three years old, where were you when that thing that happened that you didn't like?

A: In the hallway.

Q: In the hallway. Who was in the hallway with you?

A: Uncle Chris.

Q: Uncle Chris. And when you say Uncle Chris, whose dad is Uncle Chris?

A: [Luiz], [Melanie] and [Natalie]'s.

. . . .

Q: What did he do? Can you show me on the doll, [Belinda], what Uncle Chris did?

A: (Witness points.)

Q: Okay. What are you pointing to?

A: (Witness points.)

[STATE:] For the record, the witness is pointing at the Defendant's sexual organ.

Q: What—so you are pointing to that. So what—why are you pointing to that, what happened with Uncle Chris' middle part? Did he make you do anything?

17

A:  Yes.

Q:  Okay.  What did he make you do? Do you not want to talk about it?

A:  No.

Q:  Okay.  Can you—can you show me on the doll what Uncle Chris made you do?

A:  (Witness nods yes.)

Q:  Okay.  So he made you—he made you—are you touching the doll's middle part?

A:  (Witness nods yes.)

Q:  Okay.  And what is this—what is that middle part used for?

A:  To pee from.

Q:  And what did you touch it with?

A:  My hands.

Belinda described the incident of abuse and where it occurred, identified her abuser as her "Uncle Chris," and further identified "Uncle Chris" as the father of Luiz, Melanie, and Natalie.  To the extent that Gonzalez takes issue with the fact that Belinda did not point at and identify him in court, that goes only to the weight and credibility of her testimony, not its admissibility.  *Meeks v. State*, 897 S.W.2d 950, 954–55 (Tex. App.—Fort Worth 1995, no pet.) ("The fact that the complainant failed to identify [the defendant] at trial goes only to the weight and credibility of the witnesses.").  Identity may be proven by either direct or circumstantial evidence.  *Id.* (citing *Earls v. State*, 707 S.W.2d 82, 85 (Tex. Crim.

18

App. 1986); *Oliver v. State*, 613 S.W.2d 270, 274 (Tex. Crim. App. [Panel Op.] 1981) (op. on reh'g)).

With regard to Gonzalez's invitation that we refer to the Statement of Facts to find other examples of Belinda's incompetence or failure to identify Gonzalez as her abuser, we are not required to "construct and compose appellant's issues, facts, and arguments 'with appropriate citations to authorities and to the record.'" *Busby*, 253 S.W.3d at 673; *see also* Tex. R. App. P. 38.1(i); *Lucio*, 351 S.W.3d at 896 (if a party provides no argument or legal authority to support its position, the appellate court may properly overrule the issue or point as inadequately briefed).

Based on the record before us, we do not find that Gonzalez met his burden of establishing incompetency as to Belinda. *See Gilley*, 418 S.W.3d at 120–21. Therefore, we hold that the trial court did not abuse its discretion by finding Belinda was competent to testify. We overrule Gonzalez's first point.

### III. Sufficiency of the Evidence

In his second point, Gonzalez challenges the sufficiency of the evidence to support his conviction. In our due-process review of the sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Dobbs v. State*, 434 S.W.3d 166, 170 (Tex. Crim. App. 2014). This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the

19

evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Dobbs*, 434 S.W.3d at 170.

The trier of fact is the sole judge of the weight and credibility of the evidence. *See* Tex. Code Crim. Proc. Ann. art. 38.04 (West 1979); *Dobbs*, 434 S.W.3d at 170. Thus, when performing an evidentiary sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the factfinder. *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010). Instead, we determine whether the necessary inferences are reasonable based upon the cumulative force of the evidence when viewed in the light most favorable to the verdict. *Sorrells v. State*, 343 S.W.3d 152, 155 (Tex. Crim. App. 2011); *see Temple v. State*, 390 S.W.3d 341, 360 (Tex. Crim. App. 2013). We must presume that the factfinder resolved any conflicting inferences in favor of the verdict and defer to that resolution. *Jackson*, 443 U.S. at 326, 99 S. Ct. at 2793; *Dobbs*, 434 S.W.3d at 170. We measure the sufficiency of the evidence by the elements of the offense as defined by the hypothetically correct jury charge for the case, not the charge actually given. *Byrd v. State*, 336 S.W.3d 242, 246 (Tex. Crim. App. 2011) (citing *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)); *see Crabtree v. State,* 389 S.W.3d 820, 824 (Tex. Crim. App. 2012) ("The essential elements of the crime are determined by state law.").

The State had to prove that, during a period of more than 30 days in duration, Gonzalez committed two or more of the following acts of sexual abuse

against the children, who were younger than 14 years of age at the time: (1) aggravated sexual assault of Anna by causing his sexual organ to contact her mouth, (2) indecency with a child by causing Anna to touch his genitals, and (3) indecency with a child by causing Belinda to touch his genitals. *See* Tex. Penal Code Ann. § 21.02(b) (West Supp. 2015), § 21.11(a)(1) (West 2011), § 22.021(a)(1)(B)(ii) (West Supp. 2015).

Gonzalez argues that the evidence is insufficient because (1) Anna "repeatedly refuted the allegations" against Gonzalez during her interview with Hallum, (2) Hallum found Belinda to be incompetent during the interview, and (3) testimony by Dr. Aaron Pearce, an expert called as part of his defense, "called into question the sufficiency of the evidence."

Gonzalez does not specify how he contends Anna "repeatedly refuted" the allegations against him.[13] However, the record does reveal one occasion, early in the interview, when Anna answered in the negative when asked if anyone had "made [her] touch them . . . where they pee or poop from" or shown her "the private parts of their body." Later in the interview, when Hallum asked if Anna had told someone that something happened to her body, Anna also answered "No," but this exchange must be viewed in context. Hallum's question came after they had discussed an incident in which Anna had gotten into trouble with her

---

[13]We note that we are not obligated to search the record for facts favorable to a party's position. Tex. R. App. P. 38.1(i); *Lucio*, 351 S.W.3d at 896.

21

mother for taking photos of Belinda's bottom.  Anna proceeded to answer that she had told her mom about that incident, and, in context, Anna could have understood the question as being related to the photo-taking incident.   Later in the interview, Anna answered Hallum's question of whether somebody had done something to her body that she did not want to happen by explaining an incident in which her seven-year-old cousin had punched her.  After that, she brought up the abuse by Gonzalez.   Anna also failed to mention Gonzalez's conduct when Hallum inquired about "hurtful touches" and touches to her own body.[14]  Except for the one instance when Anna denied that anyone had made her touch "them . . . where they pee or poop from" or had shown her the "private parts of their body," we do not view Anna's statements as "refuting" the allegations against Gonzalez, nor do we find that Anna's statements, taken as a whole, could be fairly characterized as "repeatedly refuting" the allegations.  She clearly explained the incidents involving Gonzalez later in the interview when asked if somebody had done something to her body that she did not want to happen.

With regard to Gonzalez's second contention, that Hallum found Belinda to be incompetent during the interview, as set out above, we have overruled Gonzalez's point challenging Belinda's competency.   Furthermore, Gonzalez provides no citation to the record to support the assertion that Hallum found

_____

[14]Anna answered that she and her sister fight sometimes and hit each other. She also answered that sometimes her seven-year-old cousin Luiz hits her.

Belinda to be "incompetent as a witness" during the trial, nor have we found any statement in the record indicating Hallum's opinion regarding Belinda's competency to testify at trial.

Finally, as to Gonzalez's third argument regarding Pearce, the forensic psychologist who testified at trial, Pearce observed that Hallum had repeated questions in her interview of Anna. He also expressed his opinion that during the interview Hallum had posed leading or suggestive questions to Anna. According to Pearce, the use of repeated, leading, or suggestive questions may have reinforced inaccurate information.[15] In her interview with Anna, Hallum asked the following:

> Q: What did you come to talk about today?
>
> A: About school—and Mimi and Papa's.
>
> . . . .
>
> Q: Has there been something that's happened to you or someone in your family that you would be here to talk about?
>
> A: Mmhmm.
>
> Q: Yeah? What would that be?
>
> A: Um, that I love them very much.
>
> Q: . . . Anything else?
>
> A: (Shakes head)
>
> . . . .

[15]Pearce was not a forensic investigator and did not personally interview Anna or Belinda.

23

Q: Has that ever happened to you when you've gotten a hurtful touch from someone?

A: Mmhmm—sometimes my sister and I fight and she kind of hits me sometimes.

. . . .

Q: Has there ever been a time when a grown up or a big kid has hurt your body?

A: Um, my cousin's a big kid . . . and he's seven . . . and he can hit really hard and nothing hurts him.

. . . .

Q: Has there ever been a time when anyone's ever touched you where you go pee from?

A: No.

Q: Has there ever been a time, [Anna], when anyone's ever touched you where you go poop from?

A: No.

Q: Has there ever been a time when anyone's ever tried to touch you where you go pee or where you go poop from?

A: . . . No.

Q: Has there ever been a time when anyone's ever made you touch them on their body where they pee or poop from?

A: Uh-uh. (Shakes head)

Q: Has anyone ever shown you the private parts of their body?

A: Uh-uh. (Shakes head)

. . . .

Q: I understand that you told someone that something had happened to your body. Did you tell someone that?

24

A:     Uh-uh.

After 22 minutes of questioning, Anna told Hallum about the sexual abuse by Gonzalez.

Q:     Has there ever been a time that anyone's ever done something to your private places that you didn't want to happen? Look at, or touch, or anything like that?

A:     My—my—my second uncle did.

Q:     Your second uncle did?  What did he do?

A:     He—when I was little—when I was four, um, he made me taste his butt, um, and—and when I was six, um, he made me touch it.  And my sister, too—but not taste it.

Q:     Your second uncle when you were four made you taste his butt?

A:     (Nods head)

Q:     And whenever you were six, he made you touch it?

A:     Mm-hmm.  I'm six now.

Q:     . . . What uncle is that?

A:     Um, Uncle Chris.

Q:     Is that the same Uncle Chris that we've been talking about or a different Uncle Chris?

A:     A different Uncle Chris.

Q:     Ok. . . . How is the Uncle Chris you're talking about that made you lick his butt, how is he your uncle?

A:     Because my cousin, he—because I was—because my cousin was born, um, before me and that's how he—he became my uncle.

Q:     Does that Chris have a last name that you know?

A:     Mm-hmm.

25

Q:   Yeah, what's his last name?

A:   Joseph.

Q:   Joseph?  Chris Joseph?[16]

A:   (Nods head)

Q:   Ok. Does that Chris have any kids?

A:   (Nods head)

Q:   Yeah, what's their names?

A:   Um, [Luiz], one son, um, two daughters, um, two big sisters, um, [Melanie], that's super smart, and [Natalie] that is my babysitter and my cousin.

Q:   Ok. Well, you know what, I want to know exactly what you're talking about when you say he made you kiss his butt. What happened?

A:   Not kiss. Taste.

Q:   Oh, Taste. Thank you for correcting me. What do you mean he made you taste his butt?

A:   Well, he tricked me.

Q:   How did he trick you?

A:   When I asked for a dessert in his—in his kitchen, um, for a Fruit Roll-Up, he actually unbuttoned his belt and pulled down his pants a little. Nobody was there—and he put a blindfold over me— and then—

Q:   And then what happened?

---

[16]Although Gonzalez's middle name begins with the letter "J" (he is referred to throughout the record as "Christopher J. Gonzalez"), there is no evidence in the record that his middle name is Joseph.

26

A:      And then he told me to open—and then I guess—but I didn't know what I actually know now because I tasted—his butt because Fruit Roll Ups only taste fruity, and butts only taste nasty.

Q:      Ok.  What did the butt taste like?

A:      It tasted like a bunch of garbage and—and boogers.

. . . .

Q:      What I'm going to do is repeat back what you told me. If I get anything wrong, I want you to correct me, ok?  So you said that you were in the kitchen, and that you had asked for a dessert, is that right?

A:      Mmhmm.

Q:      And you said that nobody else was there, and that he had undid his pants and pulled them down a little bit, and he put a blindfold – he covered your eyes?

A:      Yeah, with a blindfold.

Q:      And then he—he—and then what did you say happened?

A:      He unbuttoned his belt and pulled down his pants and told me to open my mouth and—he reached his butt, um, to my mouth—and then he said, "close"—because he loves me—and he just wants, um, my—my  taste on his butt because he really likes me.

Q:      Because he loves you and he just wants your taste on his butt?

A:      Mmhmm.

Q:      Ok.  What [is] a boy's butt used for?

A:      Um, just going to the restroom.

Q:      Ok, when you say go to the restroom, is that peein[g] or poopin[g] or something different?

A:      Both.

27

Q:     Both. Is a boy's butt—the boy's butt that you're talking about, is it in the front of the body or in the back of the body?

A:     Front.

While certain questions were repeated during the interview, we cannot say on this record that the questions as posed by Hallum were unduly leading or suggestive. *See, e.g., Tinlin v. State*, 983 S.W.2d 65, 70 (Tex. App.—Fort Worth 1998, pet. ref'd) ("Leading questions are questions that suggest the desired answer, instruct the witness how to answer, or put words into the witness's mouth to be echoed back.") (citing *Ballew v. State*, 452 S.W.2d 460, 461 (Tex. Crim. App. 1970); *Newsome v. State*, 829 S.W.2d 260, 269 (Tex. App.—Dallas 1992, no pet.)).

Furthermore, on several occasions Anna provided detailed descriptions about the alleged abuse after Hallum posed indisputably open-ended questions. For example, as a follow-up to their discussion about the incident which allegedly occurred while watching a football game on television,[17] Hallum simply said, "Tell me what was happening." In narrative form, Anna proceeded to tell Hallum that Gonzalez told her she could have anything she wanted, and when she asked for

---

[17]During cross-examination at trial, Anna answered "yes" to the question, "Do you remember say[ing] that when you were on the couch with Uncle Chris, that you were watching Star Wars?" She testified that she said this to Hallum, not Esperanza. However, in the videotape of her interview with Hallum, Anna said they were watching a football game, not Star Wars. Esperanza testified that Anna told her, Whitney, and Adam that Star Wars was on when she told them about the abuse on January 15, 2013, but Adam remembered Anna saying football, not Star Wars.

28

a foot massage, he told her he would give her one if she would rub his hand with her hand. Anna continued uninterrupted with her narrative, relating that she then asked Gonzalez if it was his butt or his hand and he replied that it was his hand. Hallum followed up with another open-ended question, "And what was it?" and Anna replied, "his butt."

While Anna was not initially forthcoming with information about Gonzalez at the outset of the interview, it is the jury's role to reconcile any conflicts in the evidence. *Losada v. State*, 721 S.W.2d 305, 309 (Tex. Crim. App. 1986); *see Wyatt v. State*, 23 S.W.3d 18, 30 (Tex. Crim. App. 2000) (reiterating that the jury is "the exclusive judge of the credibility of witnesses and of the weight to be given their testimony"). The jury could have attributed Anna's initial reluctance to tell Hallum about the abuse to a lack of understanding of Hallum's questions, since the initial questions concerned "hurtful touches" and touches to her own body, rather than the type of abuses that were later actually described by Anna. Or the jury may have factored in Anna's testimony that she did not tell anyone about the abuse immediately after it occurred because it was too "gross," and because she loved her uncle and did not want him to go to jail.

Despite some inconsistencies and imprecise recollections, the jury heard Anna and Belinda describe the instances of abuse, both live and through their

videotaped interviews. Both girls identified Gonzalez as their abuser.[18] The jury also heard Whitney and Adam testify as to what Anna and Belinda had told them about the abuse.

Considering all of the evidence in the light most favorable to the jury's verdict, we hold that a rational juror could have found that Gonzalez committed the essential elements of continuous sexual abuse of young children beyond a reasonable doubt. *See* Tex. Penal Code Ann. § 21.02(b) (West Supp. 2015); *Dobbs*, 434 S.W.3d at 170. We therefore overrule Gonzalez's second point.

## IV. Confrontation Clause

In his third and fourth points, Gonzalez argues that the trial court denied his right to confront his accusers by sustaining hearsay objections during part of his cross-examination of Anna and Belinda.

In his cross-examination of Anna, Gonzalez attempted to elicit testimony regarding the questions that her mother asked her after Belinda made her initial outcry on January 15, 2013:

> Q:    And we know what you told her and—because you just told us what you told her, okay.
>
> What happened when you told your mother that . . . story? What did she do?
>
> [Anna]:    She asked me some questions.

---

[18]Pearce testified that he thought that it was not clear which Chris the girls were referring to during their interviews. But both Anna and Belinda identified their abuser as the Uncle Chris who had three children whose names were Luiz, Melanie, and Natalie.

Q:    Okay. And what kind of questions did she ask you, [Anna]?

[State:]    Objection to hearsay.

Gonzalez also attempted to elicit testimony from Belinda regarding statements made by or to Anna on that date:

Q:    Okay. Do you remember when [Anna] came home from school that day?

[Belinda]:    Yeah.

Q:    And do you know if your mom asked her questions also?

A:    Yes.

Q:    Okay. And do you remember what she said, was she scared or was she—

[State:]    Objection to hearsay.

In both of these circumstances, the trial court sustained the State's hearsay objections.

We review the trial court's ruling on the admissibility of evidence for an abuse of discretion. *Carrasco v. State*, 154 S.W.3d 127, 129 (Tex. Crim. App. 2005). Hearsay is an out of court statement "offered in evidence to prove the truth of the matter asserted." Tex. R. Evid. 601, 60 Tex. B.J. 1143 (Tex. & Tex. Crim. App. 1998, amended 2015). While Gonzalez may be correct that the trial court erred in excluding Anna's testimony as to "what kind of questions" her

mother asked her,[19] we cannot say that the trial court erred in sustaining the hearsay objection as to Belinda's testimony.[20]   Nevertheless, in neither circumstance did Gonzalez make any argument following the objection, nor did he make an offer of proof.   Moreover, Gonzalez does not raise the court's hearsay ruling as a point on appeal.   Instead, Gonzalez challenges the exclusion on the basis that it violated his rights under the Confrontation Clause.

Hearsay objections and objections to violations of the Confrontation Clause are not synonymous.   *Campos v. State*, 186 S.W.3d 93, 98 (Tex. App.— Houston [1st Dist.] 2005, no pet.).   The right of confrontation, though vital to an ordered criminal justice system, is nonetheless forfeited by a defendant who does not assert his right to confrontation at trial.   *Id.*   Gonzalez failed to assert a Confrontation Clause violation in both circumstances he now complains about on appeal—when the trial court sustained the hearsay objection to the question posed to Anna and when the trial court sustained the hearsay objection to the question posed to Belinda.   Therefore, in both instances he failed to preserve his

---

[19]It does not appear that the question called for an answer that would be offered for the truth of the matter asserted.   Tex. R. Evid. 801(d) (West 2014, amended 2015).

[20]It is unclear whether the "she" referred to in the question was Anna or Whitney, but read in conjunction with the follow-up question, "was she scared," it is reasonable to infer that the question inquired as to statements made by Anna, not her mother.   In that context, the question would appear to call for inadmissible hearsay by seeking to admit out of court statements made by Anna for the truth of the matters asserted therein.   Tex. R. Evid. 801(d).

right to confrontation complaint at trial as well as review of that claim on appeal. *Reyna v. State*, 168 S.W.3d 173, 179–80 (Tex. Crim. App. 2005) (explaining that the failure to argue the Confrontation Clause as a ground for admitting evidence in response to a hearsay objection did not give the trial judge an opportunity to rule on this theory of admission, and, therefore, resulted in forfeiture of the issue); *Robinson v. State*, 310 S.W.3d 574, 577–78 (Tex. App.—Fort Worth 2010, no pet.).

Because Gonzalez has failed to preserve his complaint as to the denial of his right to confrontation, we overrule his third and fourth points.

### V. Due Process

In his fifth point, Gonzalez complains that his right to due process was violated when he was not given the opportunity to present arguments on his objection to the competency of Anna and Belinda to testify. Generally, constitutional errors are forfeited by failure to object at trial. *Clark v. State*, 365 S.W.3d 333, 339 (Tex. Crim. App. 2012) ("[I]f a party fails to properly object to constitutional errors at trial, these errors can be forfeited."); *Curry v. State*, 910 S.W.2d 490, 496 & n.2 (Tex. Crim. App. 1995); *see Anderson v. State*, 301 S.W.3d 276, 279–80 (Tex. Crim. App. 2009) ("[N]umerous constitutional rights, including those that implicate a defendant's due process rights, may be forfeited for purposes of appellate review unless properly preserved."); *Mendez v. State*, 138 S.W.3d 334, 342 (Tex. Crim. App. 2004).

Gonzalez states that he filed a motion "object[ing] to the competency of both children based upon the videotaped interview conducted by [Hallum], after which [Hallum] made a professional finding that [Belinda] appeared not to be competent." Two months prior to trial, Gonzalez filed a "Motion for Determination of Competency of Witnesses Outside the Presence of a Jury," in which he made no reference to Hallum or the videotaped interview. Instead, the motion merely recited the applicable rule of evidence and case law laying out the proper test for determining the competency of a witness and requested that the trial court "conduct a pre-trial hearing outside the presence of the jury to determine the competency of [Anna and Belinda] to testify in this case." As requested, after voir dire but prior to the beginning of the state's case in chief, the trial court held a competency hearing and determined that both girls were competent to testify. After the court announced its ruling, counsel for Gonzalez asked if the court would "entertain any argument on the competency hearing," to which the court answered "No." Gonzalez did not complain to the trial court that its refusal to hear arguments as to the children's competency violated his due process rights, nor did he re-urge his competency challenge later during trial. *See, e.g.*, *Clark*, 365 S.W.3d at 332-33 (holding that due process complaint was forfeited where there was nothing in the record to indicate that the judge or the prosecutor understood the defendant's evidentiary objections to be complaints of a denial of due process); *Gilley v. State*, 383 S.W.3d 301, 307 (Tex. App.—Fort Worth 2012) (stating that competency "may be revisited throughout the entire trial" and noting

34

that appellant did not ask the trial court to revisit its determination at any time, even after the witness testified in front of the jury), *aff'd*, 418 S.W.3d 114 (Tex. Crim. App. 2014).

Gonzalez has forfeited his complaint by failing to present his due process argument to the trial court and by failing to re-urge his competency challenge at any other point in trial.[21]  Gonzalez's complaint is also mooted by virtue of this court's consideration of his argument on appeal in its review of the trial court's competency determination, which we have affirmed.  For these reasons, we overrule his fifth point.

## VI.  Unanimity of Jury Verdict

In his sixth point, Gonzalez argues that Penal Code section 21.02 violates the constitutional right to a unanimous verdict by not requiring a unanimous verdict as to each alleged instance of sexual abuse.  Tex. Penal Code Ann. § 21.02 (West Supp. 2015).  However, Gonzalez did not raise his constitutional objection to section 21.02 at any point during the trial proceedings. He did not make any objections to the jury charge, nor was such an objection included in his motion for new trial.  Therefore, this complaint is not preserved, and we overrule his sixth point.  *See Karenev v. State*, 281 S.W.3d 428, 434 (Tex. Crim. App. 2009); *Shafer v. State*, No. 02-10-00496-CR, 2012 WL 745422, at *2 (Tex.

---

[21]Gonzalez lodged no objection to the introduction into evidence of the girls' videotaped interviews with Hallum.

App.—Fort Worth Mar. 8, 2012, pet. ref'd) (mem. op., not designated for publication) (holding appellant's claim that Section 21.02 violated the constitutional guarantee of jury unanimity was forfeited when it was not raised before the trial court).[22]

## VII. Conclusion

Having overruled all of Gonzalez's points, we affirm the trial court's judgment.

/s/ Bonnie Sudderth
BONNIE SUDDERTH
JUSTICE

PANEL: GARDNER and SUDDERTH, JJ.; and CHARLES BLEIL (Senior Justice, Retired, Sitting by Assignment).

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED: December 17, 2015

---

[22]We have previously held that section 21.02 is not constitutionally invalid in not requiring the jury to agree unanimously on which specific acts of sexual abuse were committed by the defendant. *Pollock v. State*, 405 S.W.3d 396, 405 (Tex. App.—Fort Worth 2013, no pet.).