

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-18-00060-CR

_____

ISRAEL SALINAS JR., Appellant

V.

THE STATE OF TEXAS

---

On Appeal from Criminal District Court No. 3
Tarrant County, Texas
Trial Court No. 1481852D

---

Before Sudderth, C.J.; Gabriel and Bassel, JJ.
Memorandum Opinion by Justice Bassel

# MEMORANDUM OPINION

## I.  Introduction

Appellant Israel Salinas Jr. appeals his conviction for continuous sexual abuse of Betty,[1] a child under fourteen years of age, for which he was sentenced to life in prison.  *See* Tex. Penal Code Ann. § 21.02.  In four points, Salinas challenges the sufficiency of the evidence to show that the sexual abuse was committed over thirty days or more and argues that the trial court abused its discretion by overruling various objections that he made during both the guilt-innocence phase and the punishment phase.  Because sufficient evidence supports the finding that the sexual abuse occurred over a period of thirty days or more and because the trial court did not abuse its discretion by overruling Salinas's objections, we affirm.

## II.  Factual Background

### A.  Salinas Becomes Betty's Babysitter

Mother is a single mother of three children, including Betty.  Mother testified that she met Salinas through her "ex-friend Anita" and was just friends with him.  Mother understood that Salinas had watched other people's children in the past, so she asked Salinas to watch her three children when she worked overnight at the

---

[1]We use a pseudonym to refer to the complainant.  *See* Tex. R. App. P. 9.10(a)(3); *McClendon v. State*, 643 S.W.2d 936, 936 n.1 (Tex. Crim. App. [Panel Op.] 1982).  We refer to the complainant's relatives by their relationship to her.

Walmart warehouse.[2] Sometimes Salinas came over to Mother's apartment in Hurst to watch the children overnight, and sometimes (one to three times per month) the children would spend the night at Salinas's house in Saginaw. The children referred to Salinas as "Uncle Izzy."

## B. The Outcry

Mother testified that she and her children spent Christmas 2016 at Paternal Grandmother's house and that Salinas spent Christmas with them because Paternal Grandmother invited him. Mother testified that she did not want Salinas there because she had started feeling uncomfortable with him and because he was too involved with her and her children. Mother testified that she had noticed something different about the way that he was treating Betty; he was "[t]oo clingy" and babied her, favoring her over her siblings.

Mother testified that on December 26, 2016, when they were in the car, Mother and Paternal Grandmother discussed that on the previous day, Salinas had gotten hot chocolate for Betty but that he had not gotten anything for Betty's sister, which made Mother mad that he was treating her children differently. Mother said that Betty, who was eleven years old at the time, started crying. When Mother asked Betty why she

---

[2]Mother initially testified that Salinas began watching her three children in 2015 and that he had watched her children overnight part of 2015 and all of 2016. Mother later testified that she had worked at the Walmart warehouse for one season from August or October to mid-December 2016 but that Salinas had also watched her children in 2015, just not at night. But later Mother could not recall what year Salinas had started watching her children.

3

was crying, Betty said that Salinas had hurt her. Mother asked Betty what Salinas had done, and Betty said that he had touched her. Mother stopped the car and asked where Salinas had touched her. Betty said in her "private" and pointed to her genital area. Betty did not tell Mother anything else because she seemed "freaked . . . out" that Mother was so angry.

Mother dialed 911 and was told to go to the Saginaw Police Department. Mother immediately drove there. When Paternal Grandmother and Betty were alone outside the car, Betty told Paternal Grandmother that Salinas had rolled "massage equipment" on her front and back private part and that it had made her feel bad and that it had hurt. While they were waiting at the police department, Mother asked Betty if Salinas had used his tongue and if he had shown her his private part; Betty said that he had put his private part on top of her where her genitals are and that he had used his tongue and his hands, but she did not specify where Salinas had put his tongue. The police sent them to Cook Children's Medical Center.

### C. The Sexual-Assault Examination

Stacy Henley, a sexual-assault nurse examiner at Cook Children's Medical Center, testified that she had performed a sexual-assault examination on Betty, who was eleven years old at the time. Betty told Nurse Henley, "I've been molested by my mom's friend. He touches me in the private parts. He takes his thing and he lays it

4

on my bunny."[3]  Nurse Henley asked Betty if Salinas had put his finger in her bunny, and she said yes and that it had caused her pain.  Nurse Henley asked Betty if Salinas had put his thing in her bunny, and she said no but that he had put it on top of her bunny.  Nurse Henley asked Betty if Salinas had put anything else in her bunny, and she said that he had put a back massager on her bunny.  Nurse Henley asked Betty if Salinas had ever put his mouth on her bunny, and she said yes.  Nurse Henley asked Betty if Salinas had ever put his mouth on her butt, and she said yes.  Nurse Henley asked Betty if Salinas had ever put his hand on her bunny, and she said yes and that he had rubbed it.  Nurse Henley asked Betty if she ever had to touch his thing, and she said yes.  Nurse Henley asked Betty if Salinas had ever touched her boobs, and she said yes that he had touched them under her clothes and that he had licked on her boobs under her clothes.  Betty also said that Salinas had shown her videos on his phone of naked people.

Betty told Nurse Henley that these acts had taken place at Salinas's house and at her family's old apartment.  Betty did not know when the abuse began but said that the most recent time had occurred when they lived in their old apartment.[4]  Betty said that Salinas told her to keep everything a secret.

---

[3]Nurse Henley clarified that Betty used the term "bunny" to refer to the female sexual organ and the term "thing" to refer to the male sexual organ.

[4]Nurse Henley testified that she had later clarified the "old apartment" with Mother who explained that they had moved in early December, which was a couple of weeks before the outcry.

### D. The Investigation and Salinas's Arrest

Detective Crippen of the Saginaw Police Department testified that on December 27, 2016, he was assigned a case involving alleged sexual abuse of Betty. Detective Crippen said that he had attended Betty's forensic interview at Alliance for Children but that he had watched it live on a television screen in another room. During the forensic interview, Betty made an outcry of sexual abuse. Based on Betty's outcry, Detective Crippen obtained an arrest warrant for Salinas and a search warrant for his home. During the search of Salinas's home, officers found a back massager in the master bedroom closet.

Detective Crippen testified that he and another officer interviewed Salinas after he was arrested. Salinas said that he had sexually abused Betty from her birthday in November 2015 to Thanksgiving 2016. Detective Crippen testified that Salinas had told him that Betty was ten years old when he started sexually abusing her. Salinas admitted to putting his mouth on Betty's sexual organ and on her breast, to taking nude photos of her, to penetrating her sexual organ with both his hand and his penis, to contacting her sexual organ with his penis, and to her mouth making contact with his penis. Salinas told the officers that Betty was the one who was "coming on to him" or was interested in him sexually.

### E. The Videotape of Salinas's Interview at the Police Station

A redacted version of Salinas's interview was played for the jury. During the hour-and-twenty-minute video, Salinas, who was fifty years old at the time, said that

6

Betty was ten years old when the first event happened, which was around her birthday in November 2015, and that the last event took place in a truck around Thanksgiving 2016 when she was eleven. Salinas said that the touching started by giving Betty a backrub while they were on the couch at her mother's apartment and that he then proceeded to touch her sexual organ over her pants. Salinas said that it progressed from there and that the touching that occurred at his house "was later."

During the year-long time span from November 2015 to November 2016, Salinas admitted that he did the following to Betty:

- He put his finger inside her sexual organ approximately twenty-five times.

- He stimulated her "clit" with his fingers approximately twenty-five times.

- He put his mouth on her sexual organ or on her breast four or five times.

- He put his penis in her sexual organ one time.

- He rubbed his penis on her sexual organ three or four times.

Salinas testified that he had shown Betty a masturbation video, that she had masturbated his penis with her hand, that she had put her mouth on his penis one time, that they had re-enacted scenes from *Fifty Shades of Grey* after watching the movie together, that he had taken photos of Betty while she was naked, that he had used a

7

back massager on her sexual organ, and that he had stimulated her sexual organ with his hand while he drove them around in his truck. For many of the acts, Salinas prefaced his confession by saying that Betty had initiated the acts and that he had told her that she did not have to do anything if she did not want to.

## F. Betty's Trial Testimony

Betty, who was twelve years old at the time of the trial, testified that Salinas used to babysit her at her apartment or at his house. Betty testified that Salinas had touched parts of her body that she considered to be private. Betty testified that Salinas had used his hand and a back massager to touch the part of her body that she peed with. Betty testified that Salinas had touched her pee part more than two times and that he had done so at her mom's apartment and at his house. Betty later said that Salinas had put his finger all the way inside her pee part one to five times and that it had hurt. Betty said that "other types" of touching had occurred one to fifteen times.

Betty testified that Salinas had shown her movies with naked people. Betty recalled that Salinas had taken pictures of her when she was naked.

Betty testified that Salinas had shown her his private part and that he had made her touch it with her hand. Betty said that Salinas had touched her pee part with his private part more than one time.

Betty could not recall the first time or the last time that Salinas had sexually abused her but said that it had happened "a lot." After further questioning to

8

pinpoint a time period, Betty said that the sexual abuse had started when she was nine or ten years old and was in the fourth or fifth grade. After recognizing that she had told Paternal Grandmother and Mother about the abuse when she was in the fifth grade, Betty clarified that the abuse had started when she was in the middle of fourth grade and that it had happened the summer before fifth grade but not while she was in fifth grade. Betty further testified that the sexual abuse had happened over a long period of time and that it had happened more than once.

## G. The Jury's Verdict

After hearing the testimony and reviewing the evidence summarized above, the jury found Salinas guilty of the offense of continuous sexual abuse of a young child as charged in Count One of the indictment. After hearing from two additional witnesses during the punishment phase, the jury assessed Salinas's punishment at life in prison. The trial court sentenced Salinas in accordance with the jury's recommendation. This appeal followed.

## III. Sufficient Evidence Supports the Duration Element of the Offense

In his first point, Salinas argues that the evidence is insufficient to show that he sexually abused Betty for a period that is thirty days or more. Salinas contends that the only evidence of the duration element is his confession and that the State cannot rely solely on his extrajudicial confession to establish the *corpus delicti* of the offense.

9

## A. Standard of Review

Federal due process requires that the State prove beyond a reasonable doubt every element of the crime charged. *Jackson v. Virginia*, 443 U.S. 307, 316, 99 S. Ct. 2781, 2787 (1979); *see* U.S. Const. amend. XIV. In our due-process evidentiary-sufficiency review, we view all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the crime's essential elements beyond a reasonable doubt. *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017).

This standard gives full play to the factfinder's responsibility to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Queeman*, 520 S.W.3d at 622.

The factfinder alone judges the evidence's weight and credibility. *See* Tex. Code Crim. Proc. Ann. art. 38.04; *Queeman*, 520 S.W.3d at 622. Thus, when performing an evidentiary-sufficiency review, we may not re-evaluate the evidence's weight and credibility and substitute our judgment for the factfinder's. *Queeman*, 520 S.W.3d at 622. Instead, we determine whether the necessary inferences are reasonable based on the evidence's cumulative force when viewed in the light most favorable to the verdict. *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015); *see Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017) ("The court conducting a sufficiency review must not engage in a 'divide and conquer' strategy but must consider the

cumulative force of all the evidence."). We must presume that the factfinder resolved any conflicting inferences in favor of the verdict, and we must defer to that resolution. *Murray*, 457 S.W.3d at 448–49.

## B. Relevant Law

A person commits the offense of continuous sexual abuse of a young child if, during a period that is thirty days or more in duration, a person who is seventeen years of age or older commits two or more acts of sexual abuse against a child younger than fourteen years of age. Tex. Penal Code Ann. § 21.02(b). An "act of sexual abuse" includes indecency with a child, sexual assault, aggravated sexual assault, and sexual performance with a child. *Id.* § 21.02(c)(2)–(4), (6).

> The Texas Court of Criminal Appeals has explained that the *corpus delicti* rule
>
> is one of evidentiary sufficiency affecting cases in which there is an extrajudicial confession. The rule states that[] "[w]hen the burden of proof is 'beyond a reasonable doubt,' a defendant's extrajudicial confession does not constitute legally sufficient evidence of guilt absent independent evidence of the *corpus delicti*." To satisfy the *corpus delicti* rule, there must be "evidence independent of a defendant's extrajudicial confession show[ing] that the 'essential nature' of the charged crime was committed by someone."
>
> The purpose of this judicially fashioned rule is to ensure "that a person would not be convicted based solely on his own false confession to a crime that never occurred."

*Miller v. State*, 457 S.W.3d 919, 924 (Tex. Crim. App. 2015) (citations omitted). The *corpus delicti* rule is satisfied if some evidence exists outside of the extrajudicial confession which, considered alone or in connection with the confession, shows that

11

the crime actually occurred. *Salazar v. State*, 86 S.W.3d 640, 645 (Tex. Crim. App. 2002).

## C. Analysis

As set forth above, Mother testified that Salinas had watched her children overnight part of 2015 and all of 2016. Similarly, Betty said that the sexual abuse had started when she was nine or ten years old and was in the fourth or fifth grade. Betty then narrowed down the time frame and testified that Salinas had started sexually abusing her while she was in the middle of fourth grade, that the sexual abuse had continued during the summer before fifth grade but not while she was in fifth grade,[5] and that the sexual abuse had happened over a long period of time. Although not all of the events that Betty testified about and that Salinas admitted to fall within the definition of sexual abuse in section 21.02, Betty testified to the following events that do fall within the definition of sexual abuse in the continuous-sexual-abuse statute: Salinas touched her pee part with his hand more than two times, Salinas put his finger all the way inside her pee part one to five times, Salinas showed her his private part and made her touch it with her hand, and Salinas touched her pee part with his private part more than one time.

---

[5]A reasonable inference that the factfinder could have drawn from Betty's testimony is that the touching occurred sometime during the school year while she was in fourth grade (approximately September to May) and continued during the summer after fourth grade (June to August) but stopped once she started fifth grade. This time frame constitutes more than thirty days in duration.

12

Salinas's argument—that the *corpus delicti* must be proven totally independent of his confession[6]—is contrary to established case law. As set forth above, the *corpus delicti* rule is satisfied if some evidence exists outside of the extrajudicial confession which, considered alone *or in connection with the confession*, shows that the crime actually occurred. *See id.* And here, we have testimony from Betty regarding the duration element and the sexual abuse that Salinas perpetrated on her.

Although Betty was unable to articulate the exact times and dates of the sexual abuse perpetrated on her by Salinas, viewing the evidence in the light most favorable to the prosecution, we conclude that a rational trier of fact could have found beyond a reasonable doubt that Salinas sexually abused Betty during a period that is thirty or more days in duration. *See* Tex. Penal Code Ann. § 21.02; *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Dwyer v. State*, 532 S.W.3d 535, 540 (Tex. App.—San Antonio 2017, no pet.) (holding evidence sufficient to support conviction for continuous sexual abuse of a child because the evidence showed that "touching" incidents had started as early as January 2011 and had continued through June 2012 and had occurred on numerous occasions during some weeks); *Lopez v. State*, No. 10-14-00402-CR, 2016 WL 192302,

---

[6]Salinas argues that this is an issue of first impression because there are no continuous sexual abuse cases analyzing the duration element and *corpus delicti*. The State agrees that no court has ruled on the *corpus delicti* rule in regard to the temporal element of section 21.02 but argues that Salinas's brief actually presents a much broader issue: whether the State could prove the temporal element of the crime independent of his extrajudicial confession. We agree with the State. And because the issue before us has been previously addressed, as discussed above, we are not presented with an issue of first impression.

13

at *3 (Tex. App.—Waco Jan. 14, 2016, no pet.) (mem. op., not designated for publication) (holding that although victim was unable to articulate the exact times and dates of the sexual abuse perpetrated by appellant, there was sufficient evidence to allow the jury to determine whether two or more instances of sexual abuse had occurred during a period that was thirty days or more, especially given that the testimony established that the touching had occurred at least fifteen times from January to June 2013). We overrule Salinas's first point.

## IV. The Trial Court's Overruling of Salinas's Objection to an Improper Commitment Question Was Harmless

In his second point, Salinas argues that the trial court abused its discretion by overruling his objection to an improper commitment question during voir dire.

### A. Pertinent Portion of Record

During voir dire, the State asked the venire panel about the range of punishment that they could consider as follows:

> [PROSECUTOR]: Okay. What about this middle section, do y'all feel comfortable with the two to 20 range and think that you could give full and fair consideration to that range of punishment anywhere from two years to 20 years in prison on indecency if you were called upon to assess punishment as to that charge?
>
> (Several panel members respond.)
>
> [PROSECUTOR]: Anybody feel like, I don't -- I just don't think I can do it, I think it's too little? Or I think it's too much, maybe you think 20 years is too much if you touch a kid through the clothes.
>
> [DEFENSE COUNSEL]: I -- I object, that's also [a] fact commitment question. There's no -- that's not in the indictment, Your

14

Honor. So, suggesting to the jury that you can't do it for a child over the clothes, that's not -- although that's possible, it's not -- that's a fact commitment question.

THE COURT: Overruled.

[PROSECUTOR]: Ms. Cantu, what do you think, do you feel okay with this range of punishment?

VENIREPERSON CANTU: I think so.

[PROSECUTOR]: Okay. And what about my neglected side over here, what do y'all think? Are y'all okay with this full range of punishment on indecency, the two to 20 years?

(Several panel members respond.)

The prosecutor then moved on to another line of questions.

## B. Standard of Review

We review a trial court's ruling on an allegedly improper commitment question during voir dire for an abuse of discretion. *Barajas v. State*, 93 S.W.3d 36, 38 (Tex. Crim. App. 2002). "'[A]n attorney cannot attempt to bind or commit a prospective juror to a verdict based on a hypothetical set of facts.'" *Standefer v. State*, 59 S.W.3d 177, 179 (Tex. Crim. App. 2001) (quoting *Allridge v. State*, 850 S.W.2d 471, 480 (Tex. Crim. App. 1991)). Commitment questions "commit a prospective juror to resolve, or to refrain from resolving, an issue a certain way after learning a particular fact." *Id.* It is permissible to use fact-specific hypotheticals "to explain the application of the law," however, it is improper to inquire how a venireman would respond to particular circumstances as presented in a hypothetical question. *See Atkins v. State*, 951 S.W.2d

15

787, 789–90 (Tex. Crim. App. 1997). A trial judge must determine if the hypothetical is used to properly explain the law or to improperly commit the venire to a specific result under the facts. *See id.*

Under rule 44.2(b), reviewing courts should assess the potential harm of the State's improper commitment questioning by focusing upon whether a biased juror— one who had explicitly or implicitly promised to prejudge some aspect of the case because of the State's improper questioning—actually sat on the jury. Tex. R. App. P. 44.2(b); *Sanchez v. State*, 165 S.W.3d 707, 713 (Tex. Crim. App. 2005). The ultimate harm question is as follows: Was the defendant tried by an impartial jury, or conversely, was the jury or any specific juror "poisoned" by the State's improper commitment questions on a legal issue or fact that was important to the determination of the verdict or sentence? *See Sanchez*, 165 S.W.3d at 713.

There is no single, specific rule by which reviewing courts should assess this question of harm. *See id.* at 714. But factors to consider in determining whether a trial court's error in permitting the State to ask improper commitment questions to an entire jury panel over the defendant's objection is harmful might include the following:

> 1) whether the questions were unambiguously improper and attempted to commit one or more veniremen to a specific verdict or course of action;
>
> 2) how many, if any, veniremen agreed to commit themselves to a specific verdict or course of action if the State produced certain evidence;

16

3) whether the veniremen who agreed to commit themselves actually served on the jury;

4) whether the defendant used peremptory challenges to eliminate any or all of those veniremen who had committed themselves;

5) whether the defendant exhausted all of his peremptory challenges upon those veniremen and requested additional peremptory challenges to compensate for their use on improperly committed veniremen;

6) whether the defendant timely asserted that a named objectionable venireman actually served on the jury because he had to waste strikes on the improperly committed jurors; and

7) whether there is a reasonable likelihood that the jury's verdict or course of action in reaching a verdict or sentence was substantially affected by the State's improper commitment questioning during voir dire.

*Id.* (internal citations omitted).

This is not, of course, an exhaustive or exclusive list of factors that reviewing courts might consider. *See id.* Depending upon the particular circumstances, a reviewing court might use additional or entirely different factors to assess the ultimate question of harm: was the defendant tried by a juror that had prejudged him or some aspect of his case because the State had improperly committed one or more veniremen to a verdict or course of action before hearing any evidence? *See id.*

### C. Analysis

Assuming without deciding that the question posed by the State was an improper commitment question and that the trial court therefore erred by overruling

Salinas's objection, any alleged error was harmless. *See* Tex. R. App. P. 44.2(b); *Sanchez*, 165 S.W.3d at 713.[7] As set forth above, no juror answered the objected-to question regarding the range of punishment for indecency. Because no veniremen committed to a verdict or a course of action on the indecency charge before hearing any evidence, Salinas did not use any of his peremptory challenges to remove improperly committed veniremen. Moreover, the jury found Salinas guilty of Count One—continuous sexual abuse of a young child—and was instructed "not [to] consider Counts Two through Five of the indictment." Thus, the jury did not reach the lesser-included offense of indecency. Having reviewed and considered the entire record, we conclude that any error by the trial court in denying Salinas's objection to the State's improper commitment question did not have a substantial and injurious effect or influence in determining the jury's verdict. *See Dowthitt v. State*, 931 S.W.2d 244, 251 (Tex. Crim. App. 1996) ("Because appellant was convicted of capital murder, any erroneous or misleading hypotheticals to prospective jurors about punishment for the lesser-included offense of murder made no contribution to appellant's conviction or punishment."). Accordingly, we overrule Salinas's second point.

## V.  The Trial Court Did Not Abuse Its Discretion by Overruling Salinas's Objection to the Expert's Testimony

In his third point, Salinas argues that the trial court abused its discretion by overruling his objections to "purported 'expert' testimony [that] amounted to 'junk

---

[7]Salinas does not argue that the error resulted in harm, nor does he include a harm analysis in his brief.

science.'"  Salinas also argues that the expert's testimony constituted improper opinion testimony that Betty had testified truthfully.

## A. Standard of Review

The admission of expert testimony is reviewed on appeal for an abuse of discretion. *Coble v. State*, 330 S.W.3d 253, 272 (Tex. Crim. App. 2010). A trial court's ruling on the admissibility of expert testimony will rarely be disturbed by an appellate court. *Vela v. State*, 209 S.W.3d 128, 136 (Tex. Crim. App. 2006); *Rodgers v. State*, 205 S.W.3d 525, 527–28 & n.9 (Tex. Crim. App. 2006). As with other types of evidentiary rulings, we will uphold the trial court's decision unless it lies outside the zone of reasonable disagreement. *Layton v. State*, 280 S.W.3d 235, 240 (Tex. Crim. App. 2009) (citing *Montgomery v. State*, 810 S.W.2d 372, 380 (Tex. Crim. App. 1990)). If the record supports the trial court's decision on the admission of evidence, there is no abuse of discretion. *Osbourn v. State*, 92 S.W.3d 531, 538 (Tex. Crim. App. 2002); *Montgomery*, 810 S.W.2d at 379; *Marsh v. State*, 343 S.W.3d 475, 478 (Tex. App.—Texarkana 2011, pet. ref'd).

## B. Criteria for Admitting Expert Testimony in the Field of Psychology

The Austin Court of Appeals has previously set forth the criteria for admitting expert testimony in the field of psychology:

> Pursuant to rule 702, before admitting expert testimony, the trial court must be satisfied that three conditions are met: (1) the witness qualifies as an expert by reason of his knowledge, skill, experience, training, or education; (2) the subject matter of the testimony is appropriate for expert testimony; and (3) admitting the expert testimony will actually

19

assist the fact[]finder in deciding the case. *Vela*, 209 S.W.3d at 131; *see also Jackson v. State*, 17 S.W.3d 664, 670 (Tex. Crim. App. 2000). These conditions are commonly referred to as (1) qualification, (2) reliability, and (3) relevance. *Vela*, 209 S.W.3d at 131. Reliability focuses on the subject matter of the witness's testimony. The proponent of the expert testimony must demonstrate by clear and convincing evidence that the expert testimony is reliable. *Russeau v. State*, 171 S.W.3d 871, 881 (Tex. Crim. App. 2005). The focus of the reliability analysis is to determine whether the evidence has its basis in sound scientific methodology such that testimony about "junk science" is weeded out. *Tillman[ v. State]*, 354 S.W.3d [425,] 435 [(Tex. Crim. App. 2011)]; *Jordan v. State*, 928 S.W.2d 550, 555 (Tex. Crim. App. 1996). When addressing fields of study outside the hard sciences, such as the social sciences or fields that are based primarily on experience and training as opposed to the scientific method, the requirement of reliability still applies but with less rigor than to the hard sciences. *Nenno v. State*, 970 S.W.2d 549, 561 (Tex. Crim. App. 1998), *overruled on other grounds by State v. Terrazas*, 4 S.W.3d 720 (Tex. Crim. App. 1999); *Perez v. State*, 113 S.W.3d 819, 833 (Tex. App.—Austin 2003, pet. ref'd), *overruled on other grounds by Taylor v. State*, 268 S.W.3d 571 (Tex. Crim. App. 2008).

The field of psychology is a "soft science." *See Tillman*, 354 S.W.3d at 435; *Perez*, 113 S.W.3d at 833–34. Consequently, to establish its reliability, the proponent of expert testimony in that field must establish that (1) the field of expertise involved is a legitimate one, (2) the subject matter of the expert's testimony is within the scope of that field, and (3) the expert's testimony properly relies on or utilizes the principles involved in that field. *Tillman*, 354 S.W.3d at 435–36 (citing *Nenno*, 970 S.W.2d at 561); *Davis v. State*, 329 S.W.3d 798, 814–15 (Tex. Crim. App. 2010). This analysis is "'merely an appropriately tailored translation of the *Kelly* test to areas outside of hard science.'" *Tillman*, 354 S.W.3d at 435–36 (quoting *Nenno*, 970 S.W.2d at 561). The general principles announced in *Kelly* apply, but the specific factors outlined may or may not apply depending on the context. *Coble*, 330 S.W.3d at 273 (citing *Nenno*, 970 S.W.2d at 560). The methods of proving reliability in the soft sciences will vary, depending on the field of expertise. *Nenno*, 970 S.W.2d at 561; *Perez*, 113 S.W.3d at 833–34.

Psychology is a legitimate field of study. *See Tillman*, 354 S.W.3d at 436; *Perez*, 113 S.W.3d at 834. The subject of the dynamics of child sexual abuse is a legitimate subject within the field of psychology. *See*

> *Duckett v. State*, 797 S.W.2d 906, 917 (Tex. Crim. App. 1990), *overruled on other grounds by Cohn v. State*, 849 S.W.2d 817 (Tex. Crim. App. 1993) (expert testimony concerning child-sexual-abuse syndrome and applying elements of syndrome to facts of case was properly admitted); *cf. Nenno*, 970 S.W.2d at 562 (behavior of people who sexually victimize children is legitimate field of expertise); *Morris v. State*, 361 S.W.3d 649, 656 (Tex. Crim. App. 2011) (conditioning or grooming practices associated with sexual assault of children is legitimate field of study). Accordingly, courts have repeatedly upheld the admission of expert testimony concerning behavioral characteristics exhibited by children that have been empirically shown to be common among children who have been abused. *See Cohn[]*, 849 S.W.2d [at] 819[]; *DeLeon v. State*, 322 S.W.3d 375, 382–83 (Tex. App.—Houston [14th Dist.] 2010, pet. ref'd); *Reyes v. State*, 274 S.W.3d 724, 729 (Tex. App.—San Antonio 2008, pet. ref'd); *Perez*, 113 S.W.3d at 832.

*Lubojasky v. State*, No. 03-10-00780-CR, 2012 WL 5192919, at *12 (Tex. App.—Austin Oct. 19, 2012, pet. ref'd) (mem. op., not designated for publication).

Even if the expert's testimony meets the rule 702 requirements, expert testimony that a particular witness is truthful is inadmissible under rule of evidence 702. *See Yount v. State*, 872 S.W.2d 706, 711 (Tex. Crim. App. 1993). Moreover, an expert may not offer a direct opinion on the truthfulness of a child complainant's allegations. *Schutz v. State*, 957 S.W.2d 52, 59 (Tex. Crim. App. 1997). Improper testimony about a witness's truthfulness must be objected to in order to preserve the contention for review. *See Fears v. State*, 479 S.W.3d 315, 335 (Tex. App.—Corpus Christi–Edinburg 2015, pet. ref'd); *Sanchez-Rodriguez v. State*, No. 05-12-01538-CR, 2014 WL 1178337, at *3 (Tex. App.—Dallas Mar. 21, 2014, no pet.) (mem. op., not designated for publication).

## C. Rule 705(b) Examination[8]

During a hearing outside the presence of the jury, Samantha Torrance testified that she is a forensic interviewer at Alliance for Children. Torrance said that she had interviewed 1,432 children, including Betty. Torrance testified that Betty provided sensory and peripheral details about the sexual abuse she reported, which led Torrance to conclude that Betty had not been coached. In addition to detecting coaching, Torrance described delayed outcries, the inability of children to testify to specific dates, and grooming and said that she had received training in each of those areas and had previously given testimony in those areas in other cases. Torrance stated that forensic interviewing of children is "the nationally recognized way that children who are victims of sexual abuse are interviewed to help gather their statement[s]." For purposes of the record, the State admitted Torrance's curriculum vitae, showing that she had been a forensic interviewer at Alliance for Children since January 2014; that she had completed 347.75 hours of professional training, 179 hours of forensic interviewing training, and 122 hours of forensic interview peer reviews; that she had given almost 30 hours of presentations on forensic interviews; and that she was a member of the Professional Society of Forensic Interviewers, CACTX Forensic Interview Peer Review, and Tarrant County Forensic Interview Peer Review.

---

[8]Under Texas Rule of Evidence 705(b), "[b]efore an expert states an opinion or discloses the underlying facts or data, an adverse party . . . in a criminal case must . . . be permitted to examine the expert about the underlying facts or data. This examination must take place outside the jury's hearing." Tex. R. Evid. 705(b).

Defense counsel's questions emphasized that Torrance had received an undergraduate degree in history, not in psychology; that there is no specific exam or certification to become a forensic interviewer; that the Texas Forensic Science Commission does not recognize forensic interviewing; that she had not published "a work on forensic interviews"; and that she had not taught a college class on forensic interviewing. Salinas objected to Torrance's testifying as an expert and giving conclusions as an expert. The trial court overruled Salinas's objection.

### D. Testimony at Trial

During the trial, the State asked Torrance the following questions pertaining to the truthfulness of a child's outcry:

> Q. And are there things that you look for when you're interviewing a child to see if a child could be lying or if a child could be coached to give a false allegation?
>
> A. We are trained to ask for certain details, yes.
>
> Q. And what kind of details are you trained to ask for?
>
> A. We're trained to ask about peripheral and sensory details.
>
> . . . .
>
> Q. And if somebody is, I guess, making something up or being coached to say something, is it your understanding and from your experience that they have a more difficult time coming up with sensory or peripheral details?
>
> A. Sensory and peripheral details are the details that are difficult to make up. So, for example, someone who has actually experienced being in a burning building is going to have much more tactile descriptions of what it felt like, what it felt like to breathe, what their

skin felt like, what they could see, what they could smell than someone's description who has not actually experienced that event.

And so we do specifically ask those memories or, excuse me, ask those questions to get those details to help the investigators decide whether or not a child has been coached or might be making something up.

Q. And did you -- were you able to elicit or gather sensory and peripheral details from [Betty]?

A. Yes, I was.

Q. Did you have any concerns in your interview with her as to her being coached?

A. I did not have any concerns.

Q. Did you see any red flags that caused any concern for you?

A. No.

### E. Analysis

Here, contrary to Salinas's argument that the testimony proffered by Torrance was "junk science" and that no evidence was presented by the State to support any basis for her testimony, the record demonstrates that Torrance is qualified as an expert by reason of her knowledge, experience, and training as shown by her curriculum vitae. All of the opinions offered by Torrance—about the psychology behind delayed outcries, grooming, and children's inability to testify as to certain dates—were within the scope of the field of psychology. As noted above, expert testimony about such topics has been deemed both reliable and relevant. *See Lubojasky*, 2012 WL 5192919, at \*12 (collecting cases). Because the State proved that

Torrance was qualified and that the subject matter of her testimony was reliable and relevant, the trial court did not abuse its discretion by allowing Torrance to testify as an expert. *See* Tex. R. Evid. 702; *Lubojasky*, 2012 WL 5192919, at \*11, \*13–14 (holding that trial court did not abuse its discretion by admitting testimony of licensed psychologist who testified about, among other things, the psychological reasons for delayed outcry by abuse victims and the ongoing process of disclosure and about conditioning or grooming practices associated with the sexual assault of children). We therefore overrule the portion of Salinas's third point challenging Torrance's testimony as junk science.

With regard to the remainder of Salinas's third point, arguing that Torrance provided improper opinion testimony, Salinas did not object at trial when Torrance offered her opinion that Betty had not been coached. Salinas thus waived his complaint. *See Fears*, 479 S.W.3d at 335 (holding that appellant waived his complaint that testimony from officer who interviewed child victim constituted improper opinion testimony on victim's credibility because appellant did not object on that ground at trial); *Sanchez-Rodriguez*, 2014 WL 1178337, at \*3 (holding that appellant failed to preserve for review his contention that the detective's testimony improperly commented on victim's credibility because appellant did not object at trial on the ground that it constituted an improper expert opinion on victim's truthfulness); *Ybarra v. State*, Nos. 14-03-00655-CR, 14-03-00656-CR, 2004 WL 2401406, at \*7 (Tex. App.—Houston [14th Dist.] Oct. 28, 2004, pet. ref'd) (mem. op., not designated for

publication) (holding that appellant did not preserve his complaint—that psychiatrist's testimony invaded the jury's province by improperly commenting on victim's truthfulness—because he did not voice that objection in the trial court). Accordingly, we overrule the remainder of Salinas's third point.

## VI. Section 21.02 Does Not Violate the Jury-Unanimity Requirement

In his fourth point, Salinas argues that the trial court abused its discretion by overruling his objection to the charge and by denying his motion to quash the indictment for failure to require unanimity. The crux of Salinas's arguments is that section 21.02(d) of the Texas Penal Code is unconstitutional because it allows a nonunanimous jury verdict. *See* Tex. Penal Code Ann. § 21.02(d). Salinas does not mention that this court has already held that the statute does not violate a constitutional right to a unanimous jury verdict. *See Pollock v. State*, 405 S.W.3d 396, 405 (Tex. App.—Fort Worth 2013, no pet.). Salinas's argument does not persuade us to depart from our precedent. *See id.*; *see also Waters v. State*, No. 02-17-00368-CR, 2018 WL 6565939, at *1 (Tex. App.—Fort Worth Dec. 13, 2018, pet. ref'd) (mem. op., not designated for publication); *Harris v. State*, No. 02-17-00278-CR, 2018 WL 3153605, at *2 (Tex. App.—Fort Worth June 28, 2018, pet. ref'd) (mem. op., not designated for publication). *See generally Jacobsen v. State*, 325 S.W.3d 733, 736–39 (Tex. App.—Austin 2010, no pet.) (distinguishing *Richardson v. United States*, 526 U.S. 813, 119 S. Ct. 1707 (1999), which Salinas relies on). We overrule Salinas's fourth point.

26

## VII.  Conclusion

Having overruled Salinas's four points, we affirm the trial court's judgment.

/s/ Dabney Bassel

Dabney Bassel
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered:  April 11, 2019