

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-12-00362-CR

GREGORY POLLOCK                                                        APPELLANT

V.

THE STATE OF TEXAS                                                          STATE

----------

FROM THE 158TH DISTRICT COURT OF DENTON COUNTY

----------

## OPINION

----------

### I. INTRODUCTION

A jury convicted Appellant Gregory Pollock of continuous sexual abuse of a young child, and the trial court sentenced him to life in prison without parole. In four issues, Pollock argues that the evidence is insufficient to support his conviction, that the continuous sexual abuse of a child statute is unconstitutional, and that the trial court erred by not quashing the indictment, by submitting an

improper jury charge that allowed for a nonunanimous verdict, and by assessing the maximum punishment. We will affirm.

## II. FACTUAL AND PROCEDURAL BACKGROUND

Pollock's fourth wife is Cathy, and in 2007 through 2009, they lived together in Flower Mound with Cathy's daughter Mary and son Paul.[1]

In 2007, when Mary was eleven years old and in the sixth grade, she told her school counselor Jill Adams that Pollock had asked her to pose in lingerie for him. Mary said that when she asked Pollock for an allowance, he responded by asking if she wanted to make big girl or little girl money. He then asked if she would pose in lingerie if he bought it for her, and she refused. Adams reported the incident to CPS. Adams also talked to Cathy about the allegation. Adams testified that Cathy cried and asked what she should do; Adams told Cathy to keep Mary away from Pollock until CPS could investigate.

Cathy sent Mary to stay with a friend for about a week while Cathy "tried to get to the bottom of it and find out what was going on." Mary then recanted her story. Mary told a CPS investigator that she made up the story to get back at Pollock. Mary also told Adams that she made up the story; Adams testified that Mary was nervous during the recantation and avoided Adams for the rest of the school year.

---

[1]To protect the anonymity of the children in this case, we will use aliases to refer to some of the individuals named herein. *See Daggett v. State*, 187 S.W.3d 444, 446 n.3 (Tex. Crim. App. 2005); *McClendon v. State*, 643 S.W.2d 936, 936 n.1 (Tex. Crim. App. [Panel Op.] 1982).

2

Another counselor at Mary's school testified at trial that during Mary's seventh grade year, when Mary was twelve years old, she told him that Cathy had made her recant her story to the CPS investigator the previous year. In seventh grade, Mary met and became best friends with Julie, who was also in seventh grade at Mary's school. Mary also confided in Julie that Pollock sexually abused her.

Around Christmas Eve of 2009 while Julie was at Mary's house, Julie encouraged Mary to tell Cathy about the sexual abuse. Cathy overheard the girls talking and asked what Mary had to tell her, stating, "It . . . better not be about [Pollock] . . . because I'm not falling for that anymore." Mary told Cathy that Pollock had performed oral sex on her and that she had performed oral sex on him. Cathy called Pollock and confronted him about the allegations. She decided not to contact the police.

Shortly thereafter, Mary stayed the night at Pollock's son's house and told his wife, Rachael, about the abuse. Rachael had Mary write down everything that had happened between her and Pollock. Mary wanted Rachael to take her to the police station that night because Mary said that no one in her family believed her. Rachael did not do so, but when she dropped off Mary with Cathy the following day, Rachael told Cathy about Mary's allegations and gave Cathy the letter that Mary had written. Cathy got mad and told Mary, "I told you not to tell anybody." Cathy told Rachael that she did not know what to do because she "just love[s] [Pollock] so much." She also told Mary, in front of Rachael, that

3

Mary would not have a place to live if she continued making the allegations against Pollock. Mary later told Rachael's mother Christine about the abuse, and Christine reported it to CPS.

CPS Investigator Rebecca Burchett and Flower Mound Police Department Detective Joe Adcock conducted an audiotaped interview of Mary, who told them that Pollock took nude photographs of her, put his fingers in her female sexual organ, performed oral sex on her, and received oral sex from her in exchange for money, cigarettes, drugs, and privileges. Mary said that she refused Pollock's requests to have sex with her. Forensic interviewer Krystal Powell with the Children's Advocacy Center for Denton County also interviewed Mary. Mary told Powell about the abuse and said that, in order to get a puppy, she had "to do that stuff" for two weeks and perform oral sex on Pollock. A few days later, Mary wrote a paper at school in which she explained that Pollock sexually abused her, that Cathy did not believe her until Pollock admitted to taking photographs of Mary, and that Cathy told her that Pollock would go to jail if Mary told on him. Mary also wrote that Cathy said the abuse "would never happen to [Mary] again."

Detective Adcock went to Pollock and Cathy's house and spoke with them. The detective had a digital audio recorder in his jacket pocket and recorded the exchange. Cathy said that Julie influenced Mary to make up the accusations against Pollock. Pollock denied doing anything to Mary. Detective Adcock searched the residence and recovered three phones, including Pollock's and one found in Mary's bedroom. Pollock's phone did not contain any sexually explicit

4

photographs of Mary.[2]  The phone did contain text messages between Pollock and Mary; in them, Mary said that she "didn't want to tell on" Pollock but that Julie made her, and Pollock responded, "I know."[3]  During the search, police found in Cathy's purse the letter that Mary wrote at Rachael's house.

Several days later, Pollock and Cathy went to the police station to talk to Detective Adcock.  Pollock admitted in a recorded interview that he took between twenty and fifty nude photographs of Mary on three or four occasions in 2009 but said that he deleted them all; he denied the other allegations.  He said that he gave Mary "cigarettes and privileges" in exchange for posing for the photographs and explained to her, "Can't get nothing for free."  He said he took the

---

[2]A private investigator certified in computer forensics testified that he inspected Pollock's cell phone and determined that it could take and store between forty and sixty photographs in the phone's internal memory.  The private investigator found 117 photographs on the phone, including some that had been sent to that phone.  He could not determine whether photographs had been taken and deleted from the phone and testified that photographs could be deleted from the phone with a simple process.  He also testified that the phone was compatible with a removable memory card, although none was found with the phone, and that a memory card could store additional photographs.

[3]Mary also texted Pollock, "[Julie] was like you have to tell you[r] mom he isn't making you a better person."  Pollock testified at trial that he replied, "I know," because he knew that Julie made her lie so that the girls would not be trouble.  In another text, Mary told Pollock, "I really didn't want to tell. . . .  I just don't want you and mom to get divorced or anything.  And I don't want you to be mad at me."  Pollock responded, "I'm not."  Mary responded, "How?  You and mom almost got divorced cuz of me," and Pollock texted back, "Cause i knew [Julie] made u do it to keep out of trouble."

photographs because he lost his job, was depressed, and was smoking marijuana.[4] Pollock also wrote a handwritten confession.

Investigator Burchett and Detective Adcock also interviewed Julie, who confirmed that Mary told her that Pollock took photographs of her nude, made her model lingerie, touched her, performed oral sex on her, and had her perform oral sex on him. Julie said that Pollock gave her and Mary drugs, money, cigarettes, and privileges. Julie also told the investigator and detective that she had been sexually abused by her uncle when she was younger.

Several months after Pollock was arrested, Mary recanted her allegations against Pollock. She told Detective Adcock that she and Julie made up the allegations to keep themselves out of trouble. Mary testified at trial and denied that Pollock had ever sexually abused her. She testified that she either did not remember or had lied about what she told Investigator Burchett, Detective Adcock, Rachael, and the school counselors. She also said that she wrote the paper at school because she "had nothing to write about." Mary did not remember sending Pollock texts apologizing about telling on him because she was high when she sent them. She testified that she and Julie made up the story about Pollock as an excuse if they ever got in trouble for doing drugs or "[h]anging out with . . . older guys." She also said that she made up the allegations because she did not have many friends and wanted attention.

---

[4]Pollock admitted at trial that he lied to Detective Adcock about losing his job.

Mary's biological father testified at trial and said that Mary told him that she recanted the allegations because Cathy told her to.

Julie testified at trial and recanted the allegations. She said that she and Mary made up the story after Cathy caught them in a lie when they went to a boy's house. Julie said that she and Mary made up the story based on Julie's experience with her uncle sexually abusing her.

Cathy testified that, in an unrecorded conversation at her house, Detective Adcock said Pollock would probably get probation if he took the lesser charges against him and admitted to taking nude photographs of Mary.[5] She said that she and Pollock did not know that taking photographs alone could result in a sentence of twenty-five years' to life imprisonment. Cathy testified that she and Pollock lied to Detective Adcock about the nude photographs because they did not want Cathy's family to get involved and to "just get it over with, done with." Pollock also testified that he made up the story about taking photographs of Mary because he wanted to handle the situation "quickly and quietly." He thought that the case would be dropped without any evidence.

### III. SUFFICIENCY OF THE EVIDENCE

In his first issue, Pollock argues that the evidence is insufficient to support his conviction and that the trial court erred by not granting his request for a directed verdict.

_____

[5]Detective Adcock testified that he never told anyone that Pollock would get probation if he admitted to taking nude photographs of Mary.

The standard of review applicable to a motion for directed verdict is the same used under a sufficiency review. *McDuff v. State*, 939 S.W.2d 607, 613 (Tex. Crim. App.), *cert. denied*, 522 U.S. 844 (1997); *Havard v. State*, 800 S.W.2d 195, 199 (Tex. Crim. App. 1989). In our due-process review of the sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Wise v. State*, 364 S.W.3d 900, 903 (Tex. Crim. App. 2012). This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Blackman v. State*, 350 S.W.3d 588, 595 (Tex. Crim. App. 2011).

The trier of fact is the sole judge of the weight and credibility of the evidence. *See* Tex. Code Crim. Proc. Ann. art. 38.04 (West 1979); *Wise*, 364 S.W.3d at 903. Thus, when performing an evidentiary sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the factfinder. *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010). Instead, we determine whether the necessary inferences are reasonable based upon the cumulative force of the evidence when viewed in the light most favorable to the verdict. *Sorrells v. State*, 343 S.W.3d 152, 155 (Tex. Crim. App. 2011). We must presume that the factfinder resolved any conflicting

8

inferences in favor of the verdict and defer to that resolution. *Jackson*, 443 U.S. at 326, 99 S. Ct. at 2793; *Wise*, 364 S.W.3d at 903.

A person commits continuous sexual abuse of a young child if, during a period that is thirty days or more in duration, a person commits two or more acts of sexual abuse against a child younger than fourteen years of age. Tex. Penal Code Ann. § 21.02(b) (West Supp. 2012). An "act of sexual abuse" includes indecency with a child other than by touching, sexual assault, aggravated sexual assault, and sexual performance with a child. *Id.* § 21.02(c)(2)–(4), (6).

Here, Pollock confessed to taking between twenty and fifty nude photographs of Mary on his cell phone on three or four occasions in 2009. He said that the photographs were taken "in summer to fall." A videotape of his confession was played for the jury, and his written confession was introduced into evidence. A rational juror could have found the essential elements of the offense of continuous sexual abuse of a young child based on Pollock's confession alone. *See id.* §§ 21.02(b), (c)(6); *id.* § 43.25 (West 2011) (defining offense of sexual performance by a child); *see also Jackson*, 443 U.S. at 326, 99 S. Ct. at 2793; *Wise*, 364 S.W.3d at 903.

Additionally, although Mary recanted the allegations she made against Pollock, a rational juror could have found the essential elements of the offense based on the evidence that Mary told multiple people that Pollock took nude photographs of her, had her pose in lingerie, had her perform oral sex on him, inserted his finger into her female sexual organ, and performed oral sex on her.

9

*See, e.g.*, *Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991) (holding that complainant's recantation of her videotaped testimony did not destroy its probative value and that jury was entitled to disbelieve recantation). A jury also could have disbelieved Mary's explanation that she and Julie made up the allegations against Pollock because Mary was not friends with Julie until after she made her first outcry; the record demonstrates that Mary made the first allegations against Pollock to her school counselor in the sixth grade and became friends with Julie the following year. The jury heard the audiotaped interview of Mary conducted by Investigator Burchett and Detective Adcock in January 2010. In that interview, Mary said that Pollock first took nude photographs of her in July 2009, that she gave him a "blow job" once in the summer or fall of 2009, and that he first put his fingers inside her female sexual organ and his mouth on her sexual organ around October of 2009. Mary said that Pollock took around fifty or sixty photographs of her, that he put his mouth on her sexual organ seven or eight times, and that he put his fingers in her sexual organ four times. She said that the last time Pollock touched her was in December 2009. The jury also watched the videotaped interview of Mary conducted by forensic interviewer Powell with the Children's Advocacy Center, saw the paper Mary wrote at Rachael's house and the paper she wrote at school in January 2010, and heard multiple witnesses testify about what Mary had told them about the abuse. A child sexual abuse expert also testified about the

10

reasons a child recants allegations of abuse, including that she may be scared of the consequences or want everything to go back to how it once was.

Considering all of the evidence in the light most favorable to the jury's verdict, we hold that a rational juror could have found that Pollock committed the essential elements of the offense of continuance sexual abuse of a young child beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Wise*, 364 S.W.3d at 903. We overrule Pollock's first issue.

### IV. MOTION TO QUASH

In his second issue, Pollock argues that the trial court erred by not quashing the indictment because it failed to give him proper notice so that he could prepare a defense.

An accused is guaranteed the right to be informed of the nature and cause of the accusations against him in all criminal actions. *See* U.S. Const. amend. VI; Tex. Const. art. I, § 10; *State v. Moff*, 154 S.W.3d 599, 601 (Tex. Crim. App. 2004). The indictment must be specific enough to inform the defendant of the nature of the accusations against him so that he may prepare a defense. *See Smith v. State*, 297 S.W.3d 260, 267 (Tex. Crim. App. 2009), *cert. denied*, 130 S. Ct. 1689 (2010); *Moff*, 154 S.W.3d at 601. Generally, a charging instrument that tracks the language of a criminal statute possesses sufficient specificity to provide a defendant with notice of a charged offense. *State v. Edmond*, 933 S.W.2d 120, 128 (Tex. Crim. App. 1996). But when a statute defines the manner or means of commission in several alternative ways, an indictment will fail for

11

lack of specificity if it neglects to identify which of the statutory means it addresses. *Id.*; *see State v. Barbernell*, 257 S.W.3d 248, 251 (Tex. Crim. App. 2008). The sufficiency of an indictment is a question of law and is reviewed de novo. *See Smith*, 297 S.W.3d at 267.

For the offense of continuous sexual assault of a child, the act-of-sexual-abuse element is defined as any act that is, among other things, aggravated sexual assault under penal code section 22.021, or sexual performance by a child under penal code section 43.25. *See* Tex. Penal Code Ann. § 21.02(c)(4), (6). The penal code identifies several alternative means of committing aggravated sexual assault—including intentionally or knowingly penetrating the sexual organ of a child, causing the mouth of a child to contact the sexual organ of another person, or causing the sexual organ of a child to contact the mouth of another person—and of committing sexual performance by a child. *See id.* §§ 22.021(a)(1) (West Supp. 2012); 43.25(a), (b), (d) (West 2011).

In this case, the original indictment tracked the language of section 21.02 and alleged that Pollock committed the offense by committing aggravated sexual assault and/or sexual performance of a child; specifically, the original indictment alleged that Pollock

> during a period that was 30 or more days in duration . . . from on or about the 1st day of April, 2009 through the 31st day of December, 2009, . . . , did then and there, when the defendant was 17 years of age or older, commit two or more acts of sexual abuse against [Mary], a child younger than 14 years of age, namely, aggravated sexual assault and/or sexual performance of a child.

Pollock filed a motion to quash the indictment, alleging that it failed to state how the offenses of aggravated sexual assault and sexual performance of a child were committed and that it failed to specify the dates on which the alleged acts were committed. The day of the hearing on Pollock's motion to quash, the State filed a motion to amend the indictment to allege more specifically the means by which Pollock committed aggravated sexual assault and sexual performance of a child. The amended indictment specifically alleged that Pollock,

> during a period that was 30 or more days in duration, to-wit: from on or about the 1st day of April, 2009 through the 31st day of December, 2009, . . . , did then and there, when the defendant was 17 years of age or older, commit two or more acts of sexual abuse against [Mary], a child younger than 14 years of age, namely, aggravated sexual assault, to-wit: by causing defendant's mouth to contact the sexual organ of [Mary], by causing [Mary's] mouth to contact the sexual organ of the defendant and/or by penetrating [Mary's] sexual organ with defendant's finger; and/or sexual performance of a child, to-wit: by producing or promoting a performance, to-wit: photographs, or other visual representation that can be exhibited before an audience of one or more persons, that included sexual conduct, to-wit: masturbation or lewd exhibition of the genitals, the anus, or any portion of the female breast below the top of the areola, by [Mary] . . . , or by employing, authorizing or inducing [Mary] . . . to engage in sexual conduct, to-wit: Masturbation or lewd exhibition of the genitals, the anus, or any portion of the female breast below the top of the areola.

At the hearing on Pollock's motion to quash, defense counsel argued that, even as amended, the indictment alleged multiple manner and means of committing

13

the alleged offense and lacked specificity.  The trial court denied Pollock's motion to quash and granted the State's motion to amend the indictment.[6]

The amended indictment alleged the specific means by which Pollock committed the offense of continuous sexual abuse of a young child and alleged the means by which he committed the individual sexual abuse acts of aggravated sexual assault and sexual performance by a child.  *See* Tex. Penal Code Ann. §§ 22.021; 43.25(a), (b), (d).  The State was not required to allege a specific date in the indictment, and the "on our about" language was sufficient.  *See Sledge v. State*, 953 S.W.2d 253, 256 (Tex. Crim. App. 1997).  The amended indictment gave sufficient notice to Pollock such that he could prepare a defense.  *See Smith*, 297 S.W.3d at 267; *Moff*, 154 S.W.3d at 601.  We overrule his second issue.

### V. JURY CHARGE

In his third issue, Pollock argues that the trial court erred by submitting an improper jury charge that included multiple manner and means for the

---

[6]Pollock does not complain that the amendment charged a new offense; he also does not complain of the timeliness of the amendment, and trial did not begin for over a month after the indictment was amended.  *See* Tex. Code Crim. Proc. Ann. art. 28.10(a) (West 2006) (providing for amendment of an indictment any time prior to trial and entitling defendant, upon request, to not less than ten days to respond to an amended indictment); *see id.* art. 28.10(c) (providing that no amendment may be had over defendant's objection if amendment charges additional or different offense).  We will thus address Pollock's contentions as they apply to the amended indictment. *See, e.g.*, *Riney v. State*, 28 S.W.3d 561, 566 (Tex. Crim. App. 2000) (explaining that amended portion of indictment became the "'official'" indictment upon amendment).

14

commission of the offense, which allowed a nonunanimous jury verdict. Pollock also argues that section 21.02 violates his state constitutional right to jury unanimity.

Jury unanimity is required in all criminal cases in Texas. *Cosio v. State*, 353 S.W.3d 766, 771 (Tex. Crim. App. 2011); *Landrian v. State*, 268 S.W.3d 532, 535 (Tex. Crim. App. 2008); *Ngo v. State*, 175 S.W.3d 738, 745 (Tex. Crim. App. 2005); *see also* Tex. Const. art. V, § 13. Every juror must agree that "the defendant committed the same, single, specific criminal act." *Ngo*, 175 S.W.3d at 745. But this does not mean that the "jury must unanimously find that the defendant committed that crime in one specific way." *Landrian*, 268 S.W.3d at 535. In other words, "[t]he unanimity requirement is not violated by instructing the jury on alternative theories of committing the same offense, in contrast to instructing the jury on two separate offenses involving separate incidents." *Martinez v. State*, 129 S.W.3d 101, 103 (Tex. Crim. App. 2004). A trial court may not submit "separate offenses" to the jury in the disjunctive, but a trial court may submit a disjunctive jury charge and obtain a general verdict when alternate theories or "manner and means" involve the commission of the "same offense." *Clement v. State*, 248 S.W.3d 791, 800 (Tex. App.—Fort Worth 2008, no pet.); *see also Ngo*, 175 S.W.3d at 745 (stating that the phrase "manner and means" describes how the defendant committed the specific statutory criminal act).

Penal code section 21.02 provides that for the offense of continuous sexual assault of a young child, a jury is "not required to agree unanimously on

which specific acts of sexual abuse were committed by the defendant or the exact date when those acts were committed. The jury must agree unanimously that the defendant, during a period that is 30 or more days in duration, committed two or more acts of sexual abuse." Tex. Penal Code Ann. § 21.02(d). The commission of two or more acts of sexual abuse over a specified time period—that is, the pattern of behavior or the series of acts—is the element as to which the jurors must be unanimous in order to convict. *McMillian v. State*, 388 S.W.3d 866, 872 (Tex. App.—Houston [14th Dist.] 2012, no pet.). Thus, section 21.02(d) does not allow jurors to convict on the basis of different elements, and this court and our sister courts have held that the statute does not violate the state constitutional right to jury unanimity. *See id.* (citing *Casey v. State*, 349 S.W.3d 825, 829 (Tex. App.—El Paso 2011, pet. ref'd); *Jacobsen v. State*, 325 S.W.3d 733, 737 (Tex. App.—Austin 2010, no pet.); *Reckart v. State*, 323 S.W.3d 588, 601 (Tex. App.—Corpus Christi 2010, pet. ref'd); *Render v. State*, 316 S.W.3d 846, 858 (Tex. App.—Dallas 2010, pet. ref'd), *cert. denied*, 131 S. Ct. 1533 (2011); *Lewis v. State*, No. 02-10-00004-CR, 2011 WL 2755469, at *6 (Tex. App.—Fort Worth July 14, 2011, pet. ref'd) (mem. op., not designated for publication); *Coker v. State*, No. 12-09-00331-CR, 2010 WL 5031098, at *6 (Tex. App.—Tyler Dec. 8, 2010, no pet.) (mem. op., not designated for publication)); *Kennedy v. State*, 385 S.W.3d 729, 732 (Tex. App.—Amarillo 2012, pet. ref'd); *Martin v. State*, 335 S.W.3d 867, 871 (Tex. App.—Austin 2011), *cert. denied*, 133 S. Ct. 645 (2012).

Here, the jury charge tracked the language in the indictment. The individual sexual abuse acts alleged made up the "series" of sexual acts that created a single element of continuous sexual assault of a child. *See Lewis*, 2011 WL 2755469, at *6 (explaining that unlike the case of the State charging two separate offenses in the disjunctive, section 21.02 "does not make each act a separate element but creates a single element, a 'series' of sexual abuse.") (internal citations omitted). The jury had to unanimously agree only that Pollock, during a period of thirty or more days, committed two or more acts of sexual abuse. Accordingly, the statute does not violate any constitutional right to a unanimous jury verdict, nor did the jury charge in this case allow for a nonunanimous verdict. *See id.* We overrule Pollock's third issue.

## VI. CONSTITUTIONALITY OF PUNISHMENT

In his fourth issue, Pollock argues that the trial court erred by assessing the maximum punishment of life imprisonment in violation of the United States and Texas constitutions. *See* U.S. Const. amend. VIII; Tex. Const. art. 1, § 13.

Pollock did not object to his sentence at the time it was imposed nor complain about it in a motion for new trial. We have held on numerous occasions that this type of claim must be preserved at the trial court level. *See Kim v. State*, 283 S.W.3d 473, 475 (Tex. App.—Fort Worth 2009, pet. ref'd); *Acosta v. State*, 160 S.W.3d 204, 211 (Tex. App.—Fort Worth 2005, no pet.); *see also Cisneros v. State*, No. 02-06-00103-CR, 2007 WL 80002, at *1 (Tex. App.—Fort Worth May 23, 2007, pet. ref'd) (mem. op., not designated for publication)

17

(collecting cases); *cf. Burt v. State*, 396 S.W.3d 574, 577 (Tex. Crim. App. 2013) ("A sentencing issue may be preserved by objecting at the punishment hearing, or when the sentence is pronounced."). Because Pollock did not raise his complaint in the trial court, the complaint is forfeited.[7] We overrule his fourth issue.

## VII. CONCLUSION

Having overruled Pollock's four issues, we affirm the trial court's judgment.

SUE WALKER
JUSTICE

PANEL: GARDNER and WALKER, JJ.; and CHARLES BLEIL (Senior Justice, Retired, Sitting by Assignment).

PUBLISH

DELIVERED: June 27, 2013

---

[7]Even if we were to reach the merits of his complaint, his punishment was within the statutory limits for the offense. *See* Tex. Penal Code Ann. § 21.02(h). Punishment that is imposed within the statutory limits, and that is based upon the sentencer's informed normative judgment, is generally not subject to challenge for excessiveness except in "'exceedingly rare'" situations. *Kim*, 283 S.W.3d at 476 (quoting *Ex parte Chavez*, 213 S.W.3d 320, 323–24 (Tex. Crim. App. 2006)).