

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-21-00031-CR
_____

RODNEY LEE HARRISON, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 8th District Court
Hopkins County, Texas
Trial Court No. 2027750

Before Morriss, C.J., Burgess and Stevens, JJ.
Memorandum Opinion by Justice Stevens

MEMORANDUM OPINION

A Hopkins County jury convicted Rodney Lee Harrison of one count of continuous sexual abuse of a child and one count of indecency with a child by contact. The trial court sentenced Harrison to forty-five years' confinement and twenty-five years' confinement, respectively. On appeal, Harrison argues that (1) the evidence was legally insufficient to support the jury's guilty verdict and (2) Section 21.02 of the Texas Penal Code is unconstitutional on its face and as it applied to him in this case.[1] Because we find that there was sufficient evidence to support the jury's verdict and that Section 21.02 of the Texas Penal Code is not unconstitutional, we affirm the trial court's judgment.

## I.    Background

H.P.'s[2] mother, Katie Nottingham, testified that she had known Harrison for six years. Harrison was common-law married to Nottingham's sister, Cindy Jones. But, at the time of the alleged offense, Harrison and Jones were not living together.

According to Nottingham, H.P.'s friend, A.D., spent the night with H.P. on the weekend of February 1, 2020. Around 5:00 p.m., Nottingham took both children to her mother's home for a "little birthday get-together" in Nottingham's honor. Nottingham said that Jones, Harrison, her mother, and her stepfather had been drinking beer at the party, but that she had not been drinking any type of alcohol. Nottingham recalled that Harrison left the party in a car, taking H.P. and

---

[1]Harrison also appeals his conviction of indecency with a child by contact in our cause number 06-21-00033-CR. In both cause numbers, Harrison filed a single, consolidated brief that included identical points of error. Accordingly, this opinion will address those issues to the extent they relate to either conviction.

[2]We refer to the children and any family members by initials or pseudonyms in order to protect the confidentiality of the children involved. *See* TEX. R. APP. P. 9.8(b)(2).

A.D. with him. Nottingham said that, at some point, Jones became concerned about the children being gone with Harrison and tried to contact him by telephone. Nottingham had not been too concerned at the time, but she "just wanted [Harrison] to get back with [the girls]." Eventually, Harrison returned with the girls, and both of them joined Jones and Nottingham in the back yard. Nottingham said that Jones continued to be upset "because [Harrison] took off with the girls."

Around 12:00 p.m., Harrison drove Nottingham, Jones, H.P., and A.D. back to Nottingham's home. They all went inside the residence, at which point A.D. began acting "funny[,]" like she was stressed or upset. Nottingham asked A.D. what was bothering her, and A.D. responded, "Nothing." However, not long after A.D.'s initial denial, A.D. told Nottingham, in Harrison's presence, "that [Harrison] had made them touch on him." While A.D. did not go into great detail about what had happened, Harrison claimed that he had not done anything to the girls. After Harrison left Nottingham's residence, H.P. began crying and told her mother that "[it was] true . . . that [Harrison] made [them] touch on him." Like A.D., H.P. did not go into great detail about the incident. Shortly after talking to the girls, Nottingham phoned Harrison. Harrison told Nottingham that "he was turning himself in, because it was all lies."

After receiving Nottingham's call, Harrison, along with his daughter, returned to Nottingham's residence. H.P. and A.D. "started crying and freaking out in [Nottingham's] room." Nottingham shut the door to the room and told Harrison that he needed to leave. Harrison did as he was asked. Around 4:00 a.m., Nottingham contacted the police to make a report of the incident. H.P. subsequently told Nottingham that Harrison had abused her on other occasions. Nottingham again contacted the police, who instructed her to take H.P. to the hospital

3

for an examination. Later, Nottingham took H.P. to be interviewed at the Children's Advocacy Center.

According to Nottingham, prior to the alleged incident, H.P. and Harrison had "had an awesome relationship." Nottingham said that Harrison favored H.P. over her other two children and that he would give her driving lessons and take her to the store, but he would not do the same thing with the other children.[3] Nottingham testified that she had never seen Harrison hug H.P. inappropriately, nor had she seen Harrison touch H.P. in a manner that would make Nottingham feel uncomfortable. Nottingham said that but for H.P.'s outcry and what she was later told, she would still allow Harrison in her home. Yet, Nottingham conceded that Harrison had, on many occasions, "plopped himself down in [her] chair" at her house and masturbated.[4] In Nottingham's opinion, Harrison's behavior of masturbating in front of her without her permission was not something that "raise[d] a flag in [her] mind[.]"

H.P., who was twelve years old at the time of trial, explained that she was nervous about giving her testimony. When asked for her date of birth, H.P. stated, "I don't know." But, when she was asked, "What's your birthday," she responded with the month and the day, but she did not know the year of her birth. H.P. identified Harrison as her uncle and said that he was the man sitting in the courtroom wearing a gray suit. Yet, when she was asked how long she had known her uncle, she responded, "I don't know." H.P. explained that her aunt had been in a

---

[3]On cross-examination, Nottingham admitted that Harrison had taken her other children out for ice cream and to the park. She also recalled Harrison taking another daughter out for a driving lesson when she was younger than eight years old.

[4]According to Nottingham, Harrison had never masturbated in front of the children. Nottingham said that she did not feel like Harrison would do something like that and, if she thought he would, she would not have allowed the children to be around him.

4

relationship with Harrison. According to H.P., she spent a lot of time with Harrison, and she had even spent nights at his house. When asked if she used to like Harrison, H.P. said that she did not because "[h]e just scared [her.]"

H.P. referred to a female's genitalia as "a cookie" and a male's genitalia as a "no-no square." She was asked to identify "a cookie" and a "no-no square," which she did by circling the correct anatomy on a drawing. The State then asked H.P. if Harrison had ever touched her "cookie." H.P. said that she could not remember. After the prosecutor asked H.P. to look at him, he asked her if she was still scared. H.P. said she was still afraid and then explained that she was afraid because Harrison was in the courtroom and that testifying was hard for her. Yet, H.P. eventually testified that Harrison had touched her "cookie." But, when she was asked to talk more about the alleged incident, she was unable to do so. At that point, the trial court took a brief recess.

After the recess, H.P. stated that she had seen Harrison's "no-no square," but when asked to explain what had happened, she stated, "I don't remember." But later, H.P. testified that Harrison had put his "no-no square" into her mouth and that he had done that on more than one occasion. When she was asked to explain what had happened, she again said, "I don't remember." The State asked H.P. if she remembered talking to a lady about Harrison's inappropriate behavior in an interview. H.P. said that she remembered and that she had told the lady the truth about everything.

According to H.P., there had been an incident at the lake when Harrison put his "no-no square" into her mouth, and she remembered that "white stuff" came out of it. When asked

5

about another incident that had occurred with Harrison in a car or a house, H.P. was very hesitant to talk about it, stated twice, "I don't like this," and indicated she was scared by nodding her head. The trial court then took another recess.

Despite being apprehensive when she testified at trial, during the forensic interview, which was admitted into evidence and published to the jury, H.P. explained that, in addition to the February 1 incident, Harrison had digitally, vaginally, and orally penetrated her on other occasions. Specifically, H.P. said, among other things, that Harrison abused her by putting his penis in her mouth while they were in a parking lot and while in the country and that it happened more than two times. In fact, she said that Harrison abused her just about every time he gave her driving lessons. H.P. stated, "I've been taking driving lessons for a long time, and he's making me do all this stuff all the time, and I don't like it." She also said that Harrison made H.P. touch his penis while he was driving with her about two weeks prior to the February 1 incident. H.P. explained that Harrison always abused her when they were alone, except for the February 1 incident, when her friend, A.D., was present as well. H.P said that Harrison told her that she was not to tell anyone about what he had done. H.P. believed that Harrison favored her, and he "would leave [her] brother and sister out" when he bought her candy and treats. She also said that Harrison forced her to watch a movie while in the country that had "sex parts in it" because "[she] needed to learn it." In addition, Harrison forced H.P. to watch a recording of Jones putting her mouth on Harrison's penis. H.P. said that those incidents began happening when she was ten years old and continued happening after she had turned eleven years old.

6

A.D. testified that she had spent the night with H.P. and that, during her visit, they went to a party at H.P.'s grandmother's home. According to A.D., she met Harrison in his car in the driveway in front of the house where he was sitting with and talking to H.P. A.D. said that Harrison first asked H.P. "if [A.D.] was cool." H.P. answered affirmatively, and then Harrison allowed A.D. to get in the back seat of the car. A.D. said that Harrison took the girls to a candy store and that, when they all went inside the candy store, Harrison bought each of them a "big bag" of candy. When they left the store, they got back in the car, and Harrison gave both of the girls driving lessons while they sat on his lap. According to A.D., when she was sitting on Harrison, he moved his lap around, and his private part[5] "was hard."

At some point, H.P. needed to use the restroom, so Harrison took them to Pacific Park where H.P. and A.D. used the bathroom outside of the car. A.D. then explained that she heard H.P. talking about playing a "game," which entailed inappropriately touching Harrison. A.D. said that Harrison unzipped his pants where she could see his private part and that she "was kind of scared." According to A.D., Harrison then began talking about H.P. playing the "game, and [H.P.] started touching [his private part]" with her hand. H.P. said that Harrison wanted her to touch him a second time, but she "ignored him and looked out the window"; however, she eventually touched his "private spot" with her hand again. A.D. also said that Harrison had her touch his "private part" at the same time as H.P. touched him and that he had forced both girls to

---

[5]A.D. referred to both male and female genitalia as "[p]rivate part."

move their hands "[u]p and down" while they touched him.[6]  A.D. said that, in exchange for keeping the incident secret, Harrison gave the girls five dollars.

Angela Bates, a forensic interviewer at the Children's Advocacy Center of Paris, testified that she conducted forensic interviews with H.P. and A.D. on February 7, 2020, and February 6, 2020, respectively.  During the interviews, both children made outcries regarding sexual abuse. Bates testified about the meaning of the term "grooming" and spoke about the potential issues that can result when a child has been "groomed."[7]  Bates said, "Grooming is anything that an adult does to a child to gain their trust, their influence, their -- and to have power over that child to, in turn, abuse them."  She explained that a perpetrator can groom a child in a variety of ways. "It could be anything from making them feel special, to buying them special things, to spending special time, to anything that allows that child to feel comfortable and influenced by that adult, to where they can have that power over them to therefore abuse them."  Bates also said that being a family member can play a role in grooming because a family member may have an established connection with the sexual abuse victim and might be more likely to have the opportunity to abuse that person.

In addition, Bates spoke about a child's hesitancy to speak about an incident of sexual abuse.  She stated that "talking about child sexual abuse can be uncomfortable, humiliating." Bates continued, "So it is uncomfortable for a child to talk about those things.   It's

---

[6]A.D. demonstrated the manner in which they were required to move their hands.

[7]Bates said that she had completed over 165 hours of training on grooming and other specific aspects of forensic interviewing.

8

uncomfortable for any human being to have to talk with somebody that they don't know about private and intimate and uncomfortable and painful things."

Roselyn Anglin, a certified sexual assault nurse examiner (SANE), testified that she performed H.P.'s sexual assault examination. The purpose of the examination was to "look[] for trauma and also for the collection of forensic evidence." With the exception of a bruise not associated with sexual assault, Anglin did not observe any trauma to H.P.'s body. Anglin explained that, in relation to the February 1, 2020, incident, she was not expecting to find any trauma, stating, "From what she told me, she was just touching him, so at that point, you would not assume there would be any trauma looking at her hand, and there was not." Anglin was asked whether she would have expected to find trauma as a result of the remaining alleged sexual assaults, including the allegation that Harrison assaulted H.P. by placing his sex organ into her sex organ, to which she stated, "Not necessarily, because she did not tell me exactly when it happened. But our bodies, as the vaginal area are meant to stretch, the hymen, especially if they are estrogenized, which she has had her menstrual cycle." Referring to mostly children's cases, Anglin stated that, in her experience,[8] ninety-five percent of examinations do not show trauma. In sum, Anglin found no physical evidence of H.P. having been sexually abused.

Anglin also read the statement that H.P. gave to her during her examination. Regarding the February 1 incident, H.P. explained,

> "My friend [A.D.] were taking driving lessons with [Harrison] in the parking lot in the country last week. We went to the store. He gave us some candy."
>
>     . . . .

---

[8]Anglin estimated that she had conducted more than 500 sexual assault examinations.

9

"Then we went back driving. We stopped at the park to use the bathroom. We went back to the car. We were still at the park. He made us touch his private part. You're not supposed to touch the private spot. So when we got back to Grandma's house, we didn't tell Mom. He dropped us off at my house. We told my mom what happened. He also made [A.D.] touch him, too."

Regarding other instances of abuse, H.P. said,

"He makes me do it over and over when I take driving lessons. He made me put it in my mouth. He touched me in my private spot. He put his private spot in my private spot. He did that once. It was at his house. It was just halfway."

Although Harrison admitted during the investigation that he had had sexual contact with H.P. on two occasions, at trial, he denied all the State's allegations against him. Harrison also said that Nottingham's accusation that he masturbated in front of her was not true, stating, "She just didn't want to state the fact that we was having -- we was messing around. It hadn't been going on more than one or two times."[9]

For the most part, Harrison's testimony regarding the events that took place on February 1, 2020, coincided with the other witnesses' version of events, up until the point where Harrison bought the girls candy. After that, their testimonies were vastly different. According to Harrison, after they left the store, A.D. reached into Harrison's lap and then patted his hand. Harrison said he stopped the car and said, "Man, what's going on? What are ya'll doing?" He

---

[9]On cross-examination, Harrison conceded that, while he was in prison in 1993, he had been disciplined for masturbating in front of a female correctional officer.

stated that he then reprimanded them both and returned to the party. Harrison denied ever taking

the girls to the park or to the lake.[10]

In addition, Harrison denied H.P.'s accusation that he made her watch pornographic

movies. According to Harrison, when he returned home from work one day, he noticed that

someone had watched at least part of three pornographic movies on his television. Harrison

explained that H.P. was the only person who had been in his house that day. Harrison conceded

that the movies depicted "[v]ery graphic" intercourse and oral sex between a man and a woman.

Harrison also admitted that he often recorded himself and Jones having sexual relations.

## II.      Analysis

### A.      Sufficient Evidence Supported Harrison's Conviction of Continuous Sexual Abuse of a Child

In his first point of error, Harrison contends that the State failed to present legally

sufficient evidence to prove beyond a reasonable doubt that he was guilty of continuous sexual

abuse of a child. "In evaluating legal sufficiency, we review all the evidence in the light most

favorable to the trial court's judgment to determine whether any rational jury could have found

the essential elements of the offense beyond a reasonable doubt." *Williamson v. State*, 589

S.W.3d 292, 297 (Tex. App.—Texarkana 2019, pet. ref'd) (citing *Brooks v. State*, 323 S.W.3d

893, 912 (Tex. Crim. App. 2010) (plurality op.); *Hartsfield v. State*, 305 S.W.3d 859, 863 (Tex.

App.—Texarkana 2010, pet. ref'd)). We must examine legal sufficiency pursuant to the *Brooks*

opinion, while giving deference to the responsibility of the jury "to fairly resolve conflicts in

---

[10]Harrison's brother, Kevin, testified that Harrison had several family members who were children, that they all spent a great amount of time with him, and that Harrison had never been accused of inappropriate behavior with any of them. His adult daughter, Melanie, testified in a similar manner.

testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson v. Virigina*, 443 U.S. 307, 318–19 (1979)).

In drawing reasonable inferences, the trier of fact "may use common sense and apply common knowledge, observation, and experience gained in the ordinary affairs of life." *Duren v. State*, 87 S.W.3d 719, 724 (Tex. App.—Texarkana 2002, pet. struck) (citing *Manrique v. State*, 994 S.W.2d 640, 649 (Tex. Crim. App. 1999) (Meyers, J., concurring)). As the trier of fact, the jury is the sole judge of the credibility of witnesses and the weight given their testimony and may "believe all of a witnesses' testimony, portions of it, or none of it." *Thomas v. State*, 444 S.W.3d 4, 10 (Tex. Crim. App. 2014). We give "almost complete deference to a jury's decision when that decision is based on an evaluation of credibility." *Lancon v. State*, 253 S.W.3d 699, 705 (Tex. Crim. App. 2008).

The State's indictment against Harrison tracked the language of Section 21.02(b),[11] which provides, in part:

> (b) A person commits an offense [of continuous sexual abuse of a child] if:
>
> (1) during a period that is 30 or more days in duration, the person commits two or more acts of sexual abuse, regardless of whether the acts of sexual abuse are committed against one or more victim; and
>
> (2) at the time of the commission of each of the acts of sexual abuse, the actor is 17 years of age or older and the victim is:

---

[11]The State's amended indictment alleged that, during a thirty-day period or more, Harrison committed several different acts of sexual abuse against H.P. by causing (1) the penetration of H.P.'s mouth with Harrison's sexual organ (aggravated sexual assault of a child) on two occasions, (2) the penetration of H.P.'s sexual organ by Harrison's finger (aggravated sexual assault of a child), (3) H.P.'s sexual organ to contact Harrison's sexual organ (aggravated sexual assault), and (4) H.P.'s hand to touch Harrison's genitals (indecency with a child by contact)

(A)     a child younger than 14 years of age.

TEX. PENAL CODE ANN. § 21.02(b)(1)–(2) (Supp.).

According to Harrison, "in light of the absence of any DNA or any other physical evidence corroborating [H.P.'s] outcry, the SANE examination's finding of 'no trauma,' and H.P.'s incomplete trial testimony, the jury's verdict was simply not rational." Harrison is correct that H.P. had trouble recalling details at trial.[12]   Yet, in 1990, the Texas Court of Criminal Appeals explained,

> The rules set out in *Nilsson*[13] and *Luna*[14] reflect the important public policy that we cannot expect the child victims of violent crimes to testify with the same clarity and ability as is expected of mature and capable adults.  To expect such testimonial capabilities of children would condone, if not encourage, the searching out of children to be the victims of crimes such as the instant offense in order to evade successful prosecution.

*Villalon v. State*, 791 S.W.2d 130, 134 (Tex. Crim. App. 1990).

Here, H.P. was only twelve years old when she was required to testify in front of a room full of unfamiliar people about events that would have made even adults feel uncomfortable or anxious.  However, she was not expected to recall with clarity each and every element of the charged offense in a sophisticated manner, nor was she required to use adult terminology.  *See*

---

[12]The jury heard testimony from Bates relating to a variety of reasons a child might have trouble talking about sexual abuse to an unknown group of people.  H.P. made it clear during her testimony that she was scared to talk about Harrison's abuse when he was sitting in the courtroom in front of her.  The jury was free to consider Bates's testimony as it directly related to H.P.'s problems giving her testimony.

[13]In *Nilsson*, the Texas Court of Criminal Appeals held that, in a prosecution for rape, "[p]enetration may be proved by circumstantial evidence," *Nilsson v State*, 477 S.W.2d 592, 595 (Tex. Crim. App. 1972), and that there was "no requirement that the prosecutrix be able to testify as to penetration," *id.* at 596.

[14]In *Luna v. State*, 515 S.W.2d 271, 273 (Tex. Crim. App. 1974), the court held that the child victim need not testify as to penetration.  "Penetration may be proved by circumstantial evidence," and proof of the slightest penetration is sufficient. *Id.*

13

*Villalon*, 791 S.W.2d at 134. H.P. stated that Harrison had touched her "cookie" and that he had inserted his "no-no square" into her mouth on more than one occasion. She also recalled that "white stuff" came out of his "no-no square" during an incident at the lake. And, although she had trouble explaining Harrison's separate sexual assaults at trial, she was able to clearly articulate how he abused her during her interview at the CAC. There, H.P. spoke about Harrison penetrating her mouth with his penis on several different occasions, that is, almost every time he gave her a driving lesson. H.P. also said that Harrison made her touch his penis when they were alone. In relation to the February 2020 incident when Harrison was alleged to have forced H.P. and A.D. to touch his penis, A.D.'s testimony filled any gaps that H.P. might have left when she testified at trial.

Bates also explained the meaning of the term "grooming," stating, "[It] is anything that an adult does to a child to gain their trust, their influence, their -- and to have power over that child to, in turn, abuse them." During her CAC interview, H.P. explained that Harrison gave her a lot of attention that her siblings did not get from him and that he provided her with candy, treats, and driving lessons, most of which her siblings never received. Consequently, it was reasonable for the jury to have concluded that Harrison had been grooming H.P. in order to sexually abuse her.

Yet, Harrison complains that there was no DNA or physical evidence presented by the State. While that may be true, a specific type of evidence is not necessarily required in a sexual assault case. In fact, a child victim's testimony *alone* is sufficient to support a conviction of aggravated sexual assault. *See* TEX. CODE CRIM. PROC. ANN. art. 38.07 (Supp.); *Bargas v. State*,

14

252 S.W.3d 876 (Tex. App.—Houston [14th Dist.] 2008, pet. ref'd). In *Bargas*, the child victim testified that the defendant "put his 'private spot' on her 'private spot'" in her "front private area" at the same time he was "shaking up and down" and grunting. *Bargas*, 252 S.W.3d at 885. Even though the victim used unsophisticated language, her detailed account of the sexual assault was sufficient to support a conviction. *Id.* at 888.

Lastly, Harrison emphasizes that he testified at trial and unequivocally denied the allegations leveled against him. Even so, the jury was entitled to accept the State's version of the facts and reject Harrison's version. *See Moore v. State*, 804 S.W.2d 165 (Tex. App.—Houston [14th Dist.] 1991, no pet.). In fact, the jury was allowed "to believe all, part, or none of any witness' testimony." *See Smith v. State*, 789 S.W.2d 419, 420 (Tex. App.—Houston [1st Dist.] 1990, pet. ref'd) (citing *Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986)). The law clearly sets out the standard for judging questions of sufficiency. "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virigina*, 443 U.S. 307, 318 (1979).

The State presented sufficient evidence to prove that Harrison sexually abused H.P. by forcing her to put his penis in her mouth on multiple occasions, by forcing her to touch his genitals with her hand on multiple occasions, and by penetrating H.P. with his sexual organ on at least one occasion. Further, Section 21.02(d) of the Texas Penal Code expressly provides,

> If a jury is the trier of fact, members of the jury are not required to agree unanimously on which specific acts of sexual abuse were committed by the defendant or the exact date when those acts were committed. The jurors must

15

agree unanimously that the defendant, during a period that is 30 days or more in duration, committed two or more acts of sexual abuse.

TEX. PENAL CODE ANN. § 21.02(d) (Supp.). Consequently, there is no requirement that the jury agree on the specific instances of abuse or the manner in which the abuse occurred, only that the abuse happened on two separate occasions over a period of more than thirty days. According to H.P., the various instances of abuse began when she was ten years old and continued even after she had turned eleven years old.[15] Therefore, there was sufficient evidence for the jury to find that Harrison's sexual abuse of H.P. occurred on more than two separate occasions, and well over a thirty-day period.

We, therefore, overrule Harrison's first point of error.

**B.    The Texas Continuous Sexual Abuse Statute is Not Unconstitutional**

In his second point of error, Harrison maintains that Section 21.02 of the Texas Penal Code is unconstitutional on its face and as it applied to him in this case.[16]

"Whether a statute is . . . constitutional is a question of law that we review *de novo*." *Ex parte Lo*, 424 S.W.3d 10, 14 (Tex. Crim. App. 2013). When we review such issues, "we presume that the statute is valid and that the Legislature has not acted unreasonably or arbitrarily." *Rodriquez v. State*, 93 S.W.3d 60, 69 (Tex. Crim. App. 2002). We must uphold a

---

[15]In the CAC interview, H.P. said that Harrison assaulted her every time they went for a driving lesson. Mother confirmed during her testimony that Harrison started taking H.P. out for driving lessons starting around August 2019. The evidence also showed that the assault in which both H.P. and A.D. were involved took place on February 1, 2020. The assault that occurred on February 1 was more than thirty days after H.P.'s eleventh birthday, which was December 20, 2019.

[16]Harrison objected to the language in the court's charge that read, "With regard to element 1, you need not all agree on which specific acts of sexual abuse were committed by the defendant or the exact date when those acts were committed. You must, however, all agree that the defendant committed two or more acts of sexual abuse."

16

statute if we can apply a reasonable construction that will render it constitutional. *Ely v. State*, 582 S.W.2d 416, 419 (Tex. Crim. App. [Panel Op.] 1979); *see Maloney v. State*, 294 S.W.3d 613, 626 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd) (noting that, if statute can be interpreted in two ways, one of which sustains its validity, we are to apply the interpretation sustaining its validity). The party that challenges the statute has the burden to establish its unconstitutionality. *Rodriguez*, 93 S.W.3d at 69; *Maloney*, 294 S.W.3d at 626. "[T]o prevail on a facial challenge, a party must establish that the statute always operates unconstitutionally in all possible circumstances." *State v. Rosseau*, 396 S.W.3d 550, 557 (Tex. Crim. App. 2013). Courts are to "consider the statute only as it is written, rather than how it operates in practice." *State ex rel. Lykos v. Fine*, 330 S.W.3d 904, 908 (Tex. Crim. App. 2011).

Section 21.02(b) provides, in part:

> (b) A person commits an offense [of continuous sexual abuse of a child] if:

> (1) during a period that is 30 or more days in duration, the person commits two or more acts of sexual abuse, regardless of whether the acts of sexual abuse are committed against one or more victim; and

> (2) at the time of the commission of each of the acts of sexual abuse, the actor is 17 years of age or older and the victim is:

> (A) a child younger than 14 years of age.

TEX. PENAL CODE ANN. § 21.02(b)(1)–(2). Harrison maintains that Section 21.02 is unconstitutional on its face—and as it applied to him—because it allowed the jury to return a non-unanimous verdict as to the specific acts of sexual abuse that were relied on by the State to support the verdict.

17

Contrary to Harrison's assertion, several of our sister courts have held that

> the acts of sexual abuse listed in the statute are not elements of the offense; instead, the element of the offense on which jury unanimity is required is the "commission of two or more acts of sexual abuse over a specific time period—that is, the pattern of behavior or the series of acts[.]"

*See Holton v. State*, 487 S.W.3d 600, 606 (Tex. App.—El Paso 2015, no pet.) (quoting *Pollock v. State*, 405 S.W.3d 396, 405 (Tex. App.—Fort Worth 2013, no pet.); *Casey v. State*, 349 S.W.3d 825, 829 (Tex. App.—El Paso 2011, pet. ref'd) (continuous sexual abuse statute criminalizes the series of acts, rather than individual acts themselves, the series being key element of offense)). "The 'series' itself is the key 'element' of the offense on which jury unanimity is required; the individual acts of sexual abuse enumerated in the statute are simply the 'manner and means' by which the series is committed." *Holton*, 487 S.W.3d at 606–07. Consequently, when there is evidence of two or more acts over a specified period—as is the case here—"the jurors need not agree as to which individual acts were committed as long as they agree that the defendant committed at least two." *See Jacobson v. State*, 325 S.W.3d 733, 737 (Tex. App.—Austin 2010, no pet.). For these reasons, we find that Section 21.02 is not unconstitutional on its face and that, based on the evidence presented at trial, it is not unconstitutional as it was applied to Harrison.

We, therefore, overrule Harrison's second point of error.

## III.     Conclusion

We affirm the judgment of the trial court.


                                    Scott E. Stevens
                                    Justice

Date Submitted:     September 21, 2021
Date Decided:       December 9, 2021

Do Not Publish